HUGH M. ALCORN, STATE'S ATTORNEY, EX REL.
ALVAN W. HYDE
*vs.*
JOHN M. DOWE, COMPTROLLER

Superior Court      Hartford County      File No. 65588

MEMORANDUM FILED FEBRUARY 18, 1942.

*Robinson, Robinson & Cole*, of Hartford, for the Plaintiff.

*Francis A. Pallotti*, Attorney General; *Thomas J. Conroy*, Assistant Attorney General, and *Nicholas F. Rago*, Deputy Attorney General, for the Defendant.

INGLIS, J. This is a mandamus action brought to compel the respondent as comptroller of the State of Connecticut to enter upon his records the retirement of the relator from the service of the State as of June 30, 1941, and thereafter to draw his orders upon the treasurer of the State for the retirement salary which the relator is entitled to receive.

All of the essential facts are undisputed. They are as follows:

On June 11, 1941, the relator held the office of a public utilities commissioner under appointment of the General Assembly for a term of six years from July 1, 1935. At that time he was 60 years of age. He was also a trustee of the Connecticut State Hospital under appointment by the Governor for a term of six years from July 1, 1937. On said June 11, 1941, he presented his application to the respondent for retirement on or before June 30, 1941, under sections 67e to 77e inclusive of the 1939 Supplement to the General Statutes. As public utilities commissioner he had been receiving a salary of $9,000 *per annum* for each of the five years next preceding the date of his proposed retirement. As trustee of the Connecticut State Hospital he had received no compensation for his services. On July 3, 1941, he received notice from the relator that his application had been denied.

On April 5, 1909, the relator enlisted as a member of the First Company, Governor's Foot Guard and remained a member thereof until June 8, 1934, when he was retired at his own request. On April 5, 1909, he was appointed judge advocate and captain of that company and served as such until November 11, 1927. On that latter date he was appointed major and continued as such until June 8, 1934. As a member of the Foot Guards he received compensation on a *per diem* basis for two or three days in each year when he was in field training or on parade and as major and commandant

he received under the statute $50 per year for his responsibility for the equipment of the company.

The relator also was appointed by the Governor as voting machine commissioner on February 25, 1915, and held that office continuously until June 30, 1933. As such commissioner he was entitled to receive compensation to the extent of $100 for each examination of a voting machine. This compensation was not paid by the State but by the person applying for the examination.

The relator also served as a trustee of the Connecticut State Hospital from 1916 to June 30, 1941. As such, he has received no compensation.

He was first appointed as a public utilities commissioner on April 2, 1937, and served continuously as such until June 30, 1941.

Most of the questions of law arising in the case have been decided in the ruling on the motion to quash.* The ultimate question of fact now to be decided is as to whether in the various positions in the State government which the relator has occupied, he has been in the service of the State as that phrase is used in the statute for a sufficiently long period of years to entitle him to a retirement salary. And that is not so much a question of fact as it is a question as to the interpretation of the statute.

The essential parts of the statute, section 67e of the 1939 Supplement to the General Statutes, read as follows: "Any person in the service of the state shall, upon application by himself or the executive head of the department, commission or institution for which he is serving, be retired, subject to the following conditions as to term of service and age, and shall receive a salary as hereinafter provided: . . . ., or being a male person, having reached the age of fifty-five, after twenty-five years of service, at a salary equal to fifty per cent of his average salary for the five years next preceding his retirement; after thirty years of service, at a salary equal to sixty per cent of his average salary for the five years next preceding his retirement. . . ."

There can be no question but that a public utilities commissioner is one who is "in the service of the state" no matter

* See *infra*, p. 78.

how that phrase is to be interpreted. Accordingly, there is no doubt but that, in June, 1941, the relator was entitled to retirement. The only possible question therefore is as to whether the various positions which he had held other than that of public utilities commissioner were service of the State so as to qualify him for a retirement salary.

Certainly in the ordinary usage of the word "service", it is broad enough to cover those positions. In common parlance one is in the service of another if he is regularly rendering services to the other. It is not essential that the one in service be devoting his whole time nor that he be paid for his service. So long as one person regularly renders services to another by virtue of some arrangement between them so that the services are authorized he is in the service of that other in the ordinary sense of the word. Accordingly, in as much as both as a member of the Foot Guard, as a voting machine commissioner and as a trustee of the Connecticut State Hospital, the relator was regularly rendering services to the State, which services the State had requested, he was, in the ordinary usage of the word, in the "service" of the State.

The claim of the respondent is that the word service as used in this particular statute is to be given a much narrower meaning. He claims that it should be read as though it were "employment." That is, he claims that a person is in the service of the State only when he is working under a contract of hire for salary or wages, as distinguished from a man who is serving by enlistment in the military service or from a man who is serving without compensation.

That a man's status under the Act does not depend upon the method of his appointment is clear. Clearly elective officers come under the Act if they so desire and, therefore, clearly, it is contemplated that they are in the service of the State. If that is so, it can make no difference whether a man comes into the service by enlistment or by appointment or by election. After all, an enlistment is just as much a contract of hire as is an appointment.

The contention that in order for a person to be in the "service" of the State it must be that he is receiving some wages or salary deserves more attention. The argument is based upon the claim that the whole theory of the Act is based upon the presupposition that those who take its benefits

have been paid compensation for their services. It is true that the amount of retirement salary to be paid any person is to be computed upon the compensation which he has received during the five years next prior to his retirement. It is likewise true that everyone coming under the Act is compelled to contribute to the retirement fund a certain percentage of his compensation received after September 1, 1939.

It does not follow, however, that those features control on the question as to who is entitled to the benefits of the Act. The first mentioned feature controls only the amount which those who benefit shall receive and the provision for contributions out of a person's salary or wages, although it may delimit those who may receive retirement salaries, does not prevent those who have complied with it since September 1, 1939, from benefiting under the Act irrespective of what their status may have been prior to that date. In other words, although it is true that the administration of the Act is to be upon the theory that each beneficiary has contributed after September 1, 1939, in proportion to his salary or wages to create the fund out of which his retirement salary is to be paid, his eligibility for retirement in no way depends on any such contribution prior to that date. It, therefore, should make no difference on the question of a person's eligibility for retirement whether prior to September 1, 1939, he was receiving a salary from the State or not.

Moreover, it should be pointed out that the requirement of a contribution in proportion to salary is not, after all, an essential in the theory of the legislation. There is a provision in section 71e that no more than one-half of the retirement salaries shall be paid from the fund created by employees' contributions. It very apparently is not contemplated that employees' contributions will provide enough to pay the retirement salaries. On the contrary, the fundamental theory of the Act is that those who have rendered long and faithful service to the State shall be compensated after they retire. That is the real purpose of the Act. The provision for contributions is no more than a provision for raising funds to help the expenses of the administration of the Act. And so long as the person in the State's service has complied with the terms of the Act in this regard as well as every other he should be eligible for a retirement salary under the Act whether his wages or salary for the period of his service have been large

or small, or whether before contributions were required he was getting any compensation or not.

It is also pointed out by the respondent that, in several places in the Act, the word "employees" is used. For instance in section 72e it is provided that "any employee" of the State who was in military service in the World War shall be credited with the term of that service. Clearly here the intention of the Legislature was to distinguish between "employees" and State officials and its use of the word "employees" here does not indicate that the whole Act was to apply only to employees. It indicates, rather, the contrary.

In sections 71e and 73e the Act speaks of "employees'" contributions. But in as much as these sections deal only with contributions they have nothing to do except indirectly in determining eligibility for retirement under the Act and therefore can be given no weight in construing that part of the Act which determines such eligibility.

On the other hand it should be pointed out that if the Legislature had intended to restrict eligibility to those persons who were receiving salaries or wages from the State it would have been easy for it to do so. Instead of providing in section 67e that those who are eligible shall be "any person in the service of the state" who has rendered a specified term of "service" the General Assembly could have as easily provided that "any officer or employee of the State receiving salary or wages", or used any other apt phrase. The fact that the General Assembly chose to use the broad phrase "any person in the service of the state" indicates clearly that it meant just that and did not mean only those persons in the service of the State who were receiving a salary or wages.

Moreover, there is some indication in the other provisions of the Act that the Legislature in using the phrase "any person in the service of the state" intended that it should cover everyone who was in that service. For instance, in section 70e it is provided expressly that members of the teachers' retirement association (unless they elect otherwise), members of the judiciary and the reporter of judicial decisions, are to be excluded from the Act. This, of course, was because the retirement of those groups is provided for in other ways and such express exclusion would not have been necessary except for the fact that the Legislature understood that the phrase "any

person in the service of the state" would otherwise include them. Also, the inclusion of the provision in section 73e that elective officers and their appointees exempted from the provisions of the merit system may be elegible for retirement, although it may cut both ways in the argument, clearly makes plain the intention of the Legislature to include all possible groups in those who are to benefit from the Act. Incidentally, the offices of voting machine commissioner and trustee of the Connecticut State Hospital held by the relator from 1915 to 1933 and from 1916 to 1941, respectively, were offices filled by the appointment of the Governor and therefore in this category because by subdivision (d) of section 642e they are exempt from the Merit System Act.

On the whole, therefore, it is concluded that the words "service of the state" and "such service" and "service" are used in section 67e in their usual broad meaning and that the Legislature expressed the intention thereby to make eligible for retirement any person who for the requisite period of years had regularly rendered service to the State in any office or position (except such as are expressly excluded) irrespective of whether he received compensation for those services.

Even though there could be read into the Act the condition that a person must have been receiving compensation for his services, still the relator would qualify for retirement at at least 50 per cent of his salary because in 1941 he clearly was in the service of the State and he had passed the age of 55, and from April 5, 1909 to June 8, 1934, a period of more than 25 years, he had served the State as a member and officer of the Governor's Foot Guard and for that he received compensation. It means nothing to say that the compensation for those services was small and on a *per diem* basis because as regards the amount of compensation no line of demarcation can logically be drawn and so far as the *per diem* basis is concerned a very considerable number of State officers and employees about whom no question could possibly be raised are compensated on that basis.

However, as is pointed out above, compensation for services rendered the State has nothing to do with a determination of eligibility for retirement under the Act. That depends altogether on whether the applicant for retirement has reached the age of 50, is in the service of the State at the time he applies and has been in the service for the requisite period of

years. It is found that the relator on the date of his appli-
cation was in the service of the State as a public utilities com-
missioner and had received an average salary of $9,000 per
year for five years. It is further found that he had been in
the service of the State in accordance with the intendment of
the statute for a total of over 32 years. He was therefore,
as a matter of right, entitled to be retired on a retirement
salary of $5,400 per year.

The respondent makes the further contention that the act
which the mandamus is sought to compel him to do is not min-
isterial but is discretionary and that, not only with him, but
with the retirement commissioners. This same contention was
made on the motion to quash and was there ruled upon ad-
versely to the respondent. For that reason it will be touched
upon here only briefly.

It should be borne in mind that the Act in question, dif-
ferent from the former retirement act, gives a person in the
service of the State the absolute right to retire and receive
a retirement salary if he meets all of the requirements laid
down by the Act and if he elects to apply for retirement.
Both his right to retire and the amount of his retirement
salary are fixed by the Act. All that has to be done to
determine his right to retire or to determine the amount
of his retirement salary is to apply to the facts as they are
the mathematical formula specified in the Act. As is con-
cluded above, there is no ambiguity nor uncertainty in the
Act which would make the interpretation of it a matter of
discretion. *State ex rel. Metropolitan Life Ins. Co. vs. Up-
son,* 79 Conn. 154, 158; *American Casualty Ins. & Security
Co. vs. Fyler,* 60 id. 448; *State vs. Staub,* 61 id. 553, 568;
*Roberts vs. United States,* 176 U.S. 221, 231.

The Act is clear and the relator's rights under it are
clear. Section 69e of the 1939 Supplement to the Gen-
eral Statutes provides: "Each application for retirement shall
be made to the comptroller, who shall draw his orders upon
the treasurer for any amounts the applicant is entitled to
receive." This would seem to make it imperative upon the
comptroller, when as a matter of fact an applicant's status
entitles him under the Act to retirement, to record that ap-
plicant's retirement and draw his orders upon the treasurer
for the applicant's retirement salary. However, the re-
spondent here argues that it is not the responsibility of the

comptroller to do that until after the board of retirement commissioners has decided whether the applicant is entitled to a retirement salary and, if so, how much, and further, that in deciding this that board has a discretion.

As has already been pointed out, under the terms of the Act the right to retire and the amount of an applicant's retirement salary is fixed by the Act itself by the application to the facts of a formula set up in the Act. This leaves no room for discretion. The facts are as they are and there is no element of discretion involved in them. The statute requires the application of the formula without discretion on the part of anyone. Accordingly, it is apparent that under the Act there is nothing for the retirement commissioners to do in relation to determining whether an applicant has the right to retire or how much his retirement salary is to be.

Moreover, there is nothing in the Act which imposes any responsibility on the commissioners in this regard. It is true that section 74e in general terms provides that they shall be responsible for the carrying out of the provisions of the Act and make reports to the Governor. This, however, means simply that they shall have general oversight of the working of the Act. It is very significant that the committee which was appointed to make a study of a retirement plan prepared a draft act and submitted it to the Legislature. In this draft act the proposed section relating to the duties of the commissioners included the words: "and settle all questions that may arise thereunder." This provision, however, was stricken out by the Legislature, and if there were any doubt about the interpretation of the Act as it stands, this action by the Legislature would make it absolutely certain that the Legislature did not intend that the commissioners should have anything to do with the determination of an applicant's right to retirement or the amount of his retirement salary.

It is therefore concluded that under the facts as they are in this case the statute imposes on the comptroller the absolute duty as a ministerial act and without any room for discretion to note the relator's retirement as of June 30, 1941, and thereafter to draw his orders on the treasurer monthly for the relator's retirement salary at the rate of $5,400 *per annum*.

It is therefore concluded that a peremptory writ of mandamus should issue in accordance with the relator's prayer.

This is a writ brought to compel the performance of a public duty. For that reason no costs should be taxed against the respondent. *State ex rel. Foote vs. Bartholomew,* 111 Conn. 427, 432.

Judgment may enter ordering the respondent forthwith to take all necessary action to enter upon his records the retirement of the relator from the service of the State as of June 30, 1941, and, from and after said date to draw his orders upon the treasurer of the State monthly for the retirement salary of the relator at the rate of $5,400 per year.