Karen PINEMAN, Alphonse Marotta, Daniel Clifford, Judith Narus, Rose Schewe and Alfred K. Tyll

v.

Wiliam G. OECHSLIN, Chairman of the State Employees Retirement Commission, Henry E. Parker, Treasurer of the State of Connecticut, and J. Edward Caldwell, Comptroller of the State of Connecticut.

Civ. No. H 77–164.

United States District Court, District of Connecticut.

April 16, 1980.

Paul W. Orth, Hoppin, Carey & Powell, Hartford, Conn., for plaintiffs.

J. Sarah Posner, Asst. Attorney General, State of Connecticut, Carl R. Ajello, Attorney General, Hartford, Conn., for defendants.

MEMORANDUM OF DECISION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge.

### Contents

Introduction ............................ 527
I.  THE PARTIES .................... 529
II. THE FACTUAL BACKGROUND ...... 530
    A.  The *Fitzpatrick* Litigation ....... 530
    B.  The Plaintiffs' Reliance on Pre-
        1975 Law .................... 532
    C.  The 1975 Act ................. 533
    D.  The Legislative History of the
        1975 Act .................... 535
III. THE PLAINTIFFS' CLAIMS ........ 536
IV. THE CONTRACT CLAUSE OF THE
    UNITED STATES CONSTITUTION ... 537
    A.  Introduction ................. 537
    B.  Connecticut's Contractual Obliga-
        tions to the Plaintiffs ........... 538
        1. Contractual Obligations in Pen-
           sion Plans Under Connecticut
           Law .................... 538
        2. Mere "Gratuities" or Con-
           tractual Rights? .......... 541
        3. The Content of the Plaintiffs'
           Contractual Rights and Con-
           necticut's Obligations ...... 545
    C.  Connecticut's Impairment of
        Its Contractual Obligations ....... 546
    D.  The Unconstitutionality of
        Connecticut's Impairment of
        Its Contractual Obligations ....... 547
        1. The "Reserved Powers"
           Doctrine ................ 547
        2. Judicial Scrutiny Under the
           *United States Trust Co.*
           Tests .................... 548
           (a) Necessity ............. 549
           (b) Reasonableness ........ 552
V.  CONCLUSION .................... 553

### Introduction

This action is a sequel to this court's decision in *Fitzpatrick v. Bitzer*.[1] In that case, decided in 1974, Chief Judge Clarie held invalid the provisions of the Connecticut State Employees Retirement Act, Conn. Gen.Stat. § 5–152 *et seq.*, which required male employees of the state to work five years longer to earn pension benefits than similarly situated female employees. Judge Clarie ruled that these provisions discriminated against men on account of their sex, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").[2] The decision in *Fitzpatrick* was not appealed by the state,[3] and Connecticut began to administer its retirement statute in a manner consistent with the court's ruling, permitting both men and women to retire with full pension benefits at the lower ages formerly applicable only to women.[4]

At the next legislative session, the General Assembly passed Public Act 75–531 ("the 1975 Act"), which amended the portions of the State Employees Retirement Act which

---

**1.** 390 F.Supp. 278 (D.Conn.1974), *aff'd in part and rev'd in part on grounds not relevant here*, 519 F.2d 559 (2d Cir. 1975), *aff'd in part and rev'd in part on grounds not relevant here*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

**2.** 42 U.S.C. § 2000e *et seq.*

**3.** The appeal in *Fitzpatrick* (*see* n.1, *supra*) was taken by the plaintiffs and involved only the question whether the Eleventh Amendment to the United States Constitution barred recovery by them of monetary damages and attorney's fees. The Supreme Court ultimately held that Connecticut's immunity under the Eleventh Amendment was no obstacle to either form of relief. There was no appeal from Judge Clarie's holding in *Fitzpatrick* that the Connecticut statute violated the rights of male employees under Title VII, or from the injunction which he issued against the state officials named as defendants in *Fitzpatrick*. *See Fitzpatrick v. Bitzer, supra*, 427 U.S. at 450 n. 7, 96 S.Ct. at 2668 n.7.

**4.** Stipulation Concerning Facts, filed March 26, 1980, ¶ 2.

this court found to be discriminatory in *Fitzpatrick*. The 1975 Act established for all employees retirement ages which were identical to the higher retirement ages applicable only to *male* employees prior to *Fitzpatrick*.

In this class action, certain male and female employees of the State of Connecticut challenge the constitutionality of the 1975 Act. The state concedes that the effect of the 1975 Act was to require the plaintiffs, who had become state employees and remained in the state's service in reliance upon the terms of pre-1975 law (as modified by Judge Clarie's order), to work up to five years longer than that law had required in order to qualify for retirement with full pension benefits. The plaintiffs claim that the 1975 Act therefore impaired the state's pre-existing contractual obligations to them, in violation of the contract clause of the United States Constitution.[5]

The defendants, who are the Connecticut officials ultimately responsible for administering the State Employees Retirement Act, deny that pre-1975 law gave rise to any contractual obligations. They assert that "a pension is not a matter of contract," but "a gratuity 'springing from the appreciation and graciousness of the sovereign.'"[6] Accordingly, they argue, the plaintiffs have no rights which fall within the scope of the contract clause, even though (as they admit) the state required the plaintiffs to become members of the State Employees Retirement System and to contribute substantially to the fund out of which benefits are paid, and the plaintiffs joined and remained in the state's employ in reliance upon the terms of pre-1975 law.

With due respect, the court declines to follow the defendants' reasoning. Rather, on the basis of the uncontested facts before the court on the plaintiffs' motion for summary judgment, the court finds that the state entered into a contractual relationship with the plaintiffs, pursuant to which the state bound itself to permit the members of the plaintiff class to retire from state service on the terms provided by the law which was in effect immediately prior to the adoption of the 1975 Act. The court further finds that the 1975 Act severely impaired the state's contractual obligations to this class of its employees, and that this impairment is unconstitutional under the criteria set forth by the Supreme Court, for the state has not argued, much less established, that the abrogation of its contractual obligations was either necessary for the achievement of the state's purposes or reasonable in light of the circumstances.

Because the 1975 Act, as applied to the plaintiffs, violates the contract clause of the United States Constitution, the plaintiffs' motion for summary judgment is granted. An injunction shall be issued against the enforcement of the 1975 Act with respect to those state employees who were in state service on June 30, 1975 (the effective date of the 1975 Act), are still in the state's service, and will not be eligible to retire with full pension benefits prior to June 30, 1980.[7]

Among the plaintiffs to whom the court grants relief from the challenged statutory provisions are female state employees who entered state service prior to the enactment of the 1975 Act. The state has admitted that all of these class members relied on the promise of pension benefits set forth in the pre-1975 version of the State Employees Retirement Act, both before and after it was modified by the decision in *Fitzpatrick*. The court also grants similar relief to male employees who entered state service prior to the adoption of the 1975 Act. It may be suggested that this decision grants a "windfall" to those male class members who entered state service before this court's decision in *Fitzpatrick* by permitting them to

---

5. U.S.Const. art. I, § 10, cl. 1.

6. Brief in Opposition to Plaintiffs' Motion for Summary Judgment, p. 4, *quoting Bedford v. White*, 106 Colo. 439, 444, 106 P.2d 469, 472 (1940). The quoted language has long since been repudiated by the Supreme Court of Colorado. *See Police Pension & Relief Board v. Bills*, 148 Colo. 383, 388–89, 366 P.2d 581, 583–84 (1961); note 33, *infra*.

7. See p. 529, *infra*.

retire on terms more favorable than the ones upon which they relied under prior law. However, the court is bound by the state's admission that these class members either expected to become eligible for pension benefits on terms as favorable as those extended to female employees under pre-*Fitzpatrick* law, or remained in state service after the *Fitzpatrick* decision in reliance upon the promise of benefits identical to those of female employees which was held out to them by the state following that decision. Moreover, even apart from the question of the expectations of this group of class members, all males who were in the state's employ at the time of the *Fitzpatrick* decision became entitled, under the terms of Judge Clarie's order, to retire on the terms applicable to similarly situated female employees under the former law. The court cannot deny any males in the plaintiff class the right to retire on the terms to which similarly situated female class members are entitled without in effect undoing Judge Clarie's decision in *Fitzpatrick*.

Nothing in this ruling affects the application of the 1975 Act, on a prospective basis, to employees who were not in the state's service on June 30, 1975, and who therefore had no contractual rights to retire on the more advantageous terms afforded by prior law. The court holds only that the retroactive application of the more stringent requirements for pension eligibility contained in the 1975 Act to the discrete class of state employees who brought this action is unconstitutional.

The rules on retirement ages enforced by this decision are those embodied in contrac-

tual arrangements between the state and its employees prior to June 30, 1975. In holding the 1975 Act unconstitutional to the extent that it changed those rules retroactively as applied to the plaintiffs, the court makes no judgment concerning the wisdom of the pension policies which the state enforced prior to the enactment of the 1975 Act, or, indeed, concerning the policies embodied in the 1975 Act. Any harm to the state treasury which may be caused by the court's enforcement of the state's contractual obligations—and the state has neither shown nor suggested the existence of such harm—is the direct result of obligations assumed by the state itself and of prior judicial determinations, binding on the state, which required that Connecticut's male employees be accorded the same rights as female employees under the state's retirement system.

## I. THE PARTIES

The plaintiff class, as certified in this court's order of February 20, 1979, consists of "all existing employees of the State of Connecticut who will not reach normal retirement age prior to June 30, 1980 and who were such employees on June 30, 1975." [8] It includes both male and female employees. The phrase "normal retirement age" refers to the age at which employees are permitted to retire with pension benefits, under the State Employees Retirement Act, without regard to special provisions for early retirement.[9]

The defendants are William G. Oechslin, chairman of the State Employees Retirement Commission, Henry G. Parker, Treasurer of the State of Connecticut,[10] and J.

---

**8.** The class members were duly notified of the pendency of this action and of their rights with respect to the litigation by means of notices distributed with payroll checks to state employees on April 20, 1979. Affidavit of Sidney D. Giber, Assistant Attorney General of the State of Connecticut, filed October 29, 1979.

**9.** Under the law in force immediately prior to the effective date of the 1975 Act, the normal retirement ages were 50 for employees with 25 years of continuous state service and 55 for employees with at least 10, but less than 25, years of continuous state service. The 1975

Act raised the normal retirement ages to 55 and 60, respectively, Conn.Gen.Stat. §§ 5–162(c), 5–162(d), except for employees who would reach, prior to June 30, 1980, the normal retirement ages previously in force. Conn.Gen.Stat. § 5–163a.

**10.** The Treasurer's duties include the receipt and disbursement of public monies, Conn. Const. art. 4, § 22, including monies in the State Employees Retirement Fund, Conn.Gen. Stat. § 5–156.

Edward Caldwell, Comptroller of the State of Connecticut and Secretary of the State Employees Retirement Commission.[11] 'The State Employees Retirement Commission is responsible for administering the State Employees Retirement System and all other retirement systems of the State of Connecticut except the Teachers' Retirement Fund. Conn.Gen.Stat. § 5–155(d). Nearly all of Connecticut's employees are required by law to belong to the State Employees Retirement System.[12]

The members of the State Employees Retirement System must choose one of two benefit plans. The first of these plans is independent of the federal Social Security program; the other is coordinated with it. See Conn.Gen.Stat. §§ 5–157, 5–158a–g. Under either plan, the employees are required to make contributions to the State Employees Retirement Fund, out of which the members' retirement benefits are paid. Indeed, employees have been required to contribute to the retirement fund since 1939, when the retirement system was established.[13]

An employee not covered by Social Security must contribute 5% of his or her salary to the fund, Conn.Gen.Stat. § 5–161(b), while an employee who has Social Security coverage must contribute to the fund an amount equal to 2% of that part of his or her salary on which the state makes Social Security contributions plus 5% of the remainder of his or her salary, Conn.Gen.Stat. § 5–161(a). Actuarial studies by the state demonstrate that, depending upon the plan selected, the age of retirement and the sex of the employee, between 12% and 25% of an employee's benefits is attributable to his or her contributions, including the interest accrued on those contributions.[14] The balance of the benefits paid out of the State Employees Retirement Fund is attributable to appropriations by the state. See Conn. Gen.Stat. § 5–156a.

## II. THE FACTUAL BACKGROUND

The facts relevant to the pending motion are rather complex. However, they are not in dispute.[15] Much of the factual background is a matter of public record, particularly the record of the *Fitzpatrick* litigation. The other relevant facts were admitted by the defendants or stipulated by the parties.

### A. The Fitzpatrick Litigation

A brief recapitulation of the history of the *Fitzpatrick* litigation is the logical start-

---

11. The Comptroller is responsible for the adjustment and settlement of public accounts, Conn.Const. art. 4, § 24, including accounts for the state's pension systems, see Conn.Gen.Stat. §§ 5–156(b), 5–159.

12. Excepted are elected officials and their appointees (who may nonetheless choose to join the system), Conn.Gen.Stat. § 5–160(b), judges (who may, in the special circumstances enumerated in Conn.Gen.Stat. § 5–166a, choose to join the system, rather than a special retirement system for the judiciary), Conn.Gen.Stat. § 5–160(c), and teachers in state service, Conn. Gen.Stat. § 5–160(g). The latter must join either the State Employees Retirement System or a separate retirement system for teachers. *Id.*; Conn.Gen.Stat. § 5–158f.

13. Memorandum from JoAnn S. Mogensen, Chief of the Retirement Division of the Office of the Comptroller, State of Connecticut, to Sidney D. Giber, Assistant Attorney General of the State of Connecticut, March 10, 1980, p. 1 (hereafter referred to as the "Mogensen Memorandum"), annexed as an exhibit to the Stipulation Concerning Facts, filed March 26, 1980.

14. Mogensen Memorandum, p. 2. If the accrued interest were not credited to employees' contributions, the range would be from 6.9% to 12.8% of benefits. *Id.*

15. The absence of a genuine issue of material fact is, of course, a prerequisite to the availability of summary judgment under Rule 56, Fed.R. Civ.P. Although the parties admitted and stipulated to a fairly complicated set of facts, the court would have been greatly assisted had the parties prepared and filed the statements required by Rule 9(d) of the Local Rules Governing Civil Procedure in this District. That rule requires the party moving for summary judgment to include in his moving papers "a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried," and requires the opposing party to file "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Because Rule 9(d) statements facilitate the determination whether summary judgment is an appropriate remedy, compliance with the rule is mandatory.

ing point for the narrative of the facts relevant here. The *Fitzpatrick* plaintiffs were members of the class of male state employees and former employees who belonged to the State Employees Retirement System. *Fitzpatrick v. Bitzer, supra*, 390 F.Supp. at 279. They challenged the following statutory provisions then in effect:

(1) Former Conn.Gen.Stat. § 5–162(c)(1), which allowed an employee with 25 years of state service to retire with pension benefits "on or after the member's fifty-fifth birthday, if a man, or fiftieth birthday, if a woman";

(2) Former Conn.Gen.Stat. § 5–162(d)(1), which allowed any female employee with at least 10, but less than 25, years of state service to retire with pension benefits at age 60, but only permitted a male employee who had served for that period of time to retire with pension benefits at age 65; [16]

(3) Former Conn.Gen.Stat. § 5–162(d)(3), which provided that the calculation of retirement benefits be made according to a table based on age and sex, which ensured that a female retiree would receive retirement benefits equal to those received by a male retiree five years her senior;

(4) Former Conn.Gen.Stat. § 5–163(c), which permitted an employee whose state service was terminated under one of certain enumerated conditions to retire with pension benefits after the completion of 25 years of state service "before he has reached his fifty-fifth birthday, if a man, or her fiftieth birthday, if a woman . . . ."; and

(5) Former Conn.Gen.Stat. § 5–166(a), which provided that, in certain circumstanc-

es, an employee who left state employment before reaching the normal age of eligibility would be eligible for retirement income, on a reduced actuarial basis, at age 55 if male, or age 50 if female.

*See Fitzpatrick v. Bitzer, supra*, 390 F.Supp. at 281.

In *Fitzpatrick*, Judge Clarie held that these statutory provisions violated Title VII of the Civil Rights Act of 1964, as amended in 1972.[17] *Fitzpatrick v. Bitzer, supra*, 390 F.Supp. at 288. The court granted the plaintiffs' request for injunctive relief, prohibiting the defendants from administering the State Employees Retirement Act in a discriminatory manner in the future. *Id.* at 290. The court's order stated:

"The defendants are accordingly ordered to administer the State Employees' Retirement Act without unreasonable sex classifications unfavorable to men as they relate to retirement age and benefit computations; *so that men will be eligible to retire at age 50 and receive the same treatment as similarly situated women.* Nothing herein shall be construed to interfere with the State Legislature performing its constitutional function of freely determining public policy, as it pertains to deciding upon a uniform retirement age for all men and women employees of the State of Connecticut in the future, provided the same is carried out without discrimination as to age or benefits on the basis of sex."

390 F.Supp. at 290 (emphasis added).

As a result of this order, from which, as noted, the state did not appeal,[18] the State

---

**16.** This provision also permitted female employees with at least five but less than ten years of state service to retire with pension benefits at age 65; no male employee could retire with less than ten years of state service under this provision, regardless of his age. *See* former Conn.Gen.Stat. § 5–162(d)(1)(A).

**17.** The 1972 amendment, Pub.L. No. 92–261, § 2, brought state employees within the protection of Title VII's prohibition of sex discrimination in employment. *Fitzpatrick v. Bitzer, supra*, 427 U.S. at 449 n.2, 96 S.Ct. at 2668 n.2. In view of his decision under the federal statute, it was unnecessary for Judge Clarie to

consider the plaintiffs' claim that the Connecticut statute also violated the equal protection clause of the Fourteenth Amendment to United States Constitution. *Fitzpatrick v. Bitzer, supra*, 390 F.Supp. at 290; *id.*, 427 U.S. at 449 n.3, 96 S.Ct. at 2668 n.3.

**18.** *See* n.3, *supra*. The Supreme Court's decision in *Fitzpatrick* held that the retired members of the plaintiff class were entitled to "an award of retroactive retirement benefits as compensation for losses caused by the State's discrimination," *Fitzpatrick v. Bitzer, supra*, 427 U.S. at 449–56, 96 S.Ct. at 2667, as well as reasonable attorney's fees, *id.* at 456–57, 96

of Connecticut enforced the existing provisions of the State Employees Retirement Act so that men were treated precisely as women previously had been treated. Men with 25 years of continuous service were thus permitted to retire at age 50 after Judge Clarie's order; other men in state service were likewise permitted to retire upon the terms applicable to similarly situated females.[19]

## B. The Plaintiffs' Reliance on Pre-1975 Law

Through admissions and exhibits obtained from the defendants, the plaintiffs have established the following facts relevant to the question of the plaintiffs' reliance on the law as it stood prior to the 1975 Act.[20]

At least since 1971, employees and prospective employees of the State of Connecticut have been made aware of the retirement benefits available to them under state law, at or before the time they were hired. Moreover, prospective employees have frequently inquired, before entering the state's employ, about Connecticut's retirement benefit laws, the State Employees Retirement System and the benefits to which they would be entitled if they became state employees. The booklet which the state distributes to new employees to describe the State Employees Retirement System declares: "You may retire—and receive immediate retirement benefits—at any time after you reach the minimum permissible retirement age." Nowhere in that booklet does the state expressly reserve the right to change the minimum permissible retire-

ment ages, and the defendants have not argued that the state ever conveyed to the plaintiffs any intention to reserve such rights.

State employees rely upon the information which the state conveys to them about its retirement laws, systems and benefits, without regard to subsequent changes adverse to them. Indeed, some of the plaintiffs accepted state employment, leaving otherwise more lucrative positions, because of superior retirement benefits available to them as state employees.

After joining state service, Connecticut's employees frequently inquire about retirement benefits, including the options available to them under state law and the ages at which state law entitles them to retire with benefits. The information which state employees learn from such inquiries is a material and substantial factor in their personal retirement plans. Accordingly, the terms of the State Employees Retirement Act are substantial inducements for prospective employees to enter state service and for those already in the state's employ to remain in state service.

The law upon which female members of the plaintiff class relied was the State Employees Retirement Act, as it read prior to its amendment in 1975. The provisions of that law which governed the retirement ages and benefits of women were in no way affected by the decision of the court in *Fitzpatrick*.

Prior to that decision, which was filed on September 16, 1974, the law upon which most male employees relied contained the

---

S.Ct. at 2671. As a result of this holding, the retired plaintiffs in *Fitzpatrick* received compensatory payments for the period commencing March 24, 1972 (the effective date of the 1972 amendments to Title VII), which left them with benefits identical to what they would have received had they been permitted to retire at the ages formerly applicable only to women. Mogensen Memorandum, p. 1.

**19.** Stipulation Concerning Facts, filed March 26, 1980, ¶ 2.

**20.** The facts recounted in this section of the court's opinion were established by the defendants' failure to respond to the plaintiffs' Request for Admissions, filed July 13, 1979. Un-

der Rule 36(a), Fed.R.Civ.P., the failure of a party served with such a request to respond within thirty days of service constitutes an admission of the matters requested. According to Rule 36(b), Fed.R.Civ.P., "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Counsel for the defendants has not moved to withdraw or amend the admissions. Nor have the defendants attempted to file a response, however untimely, to the plaintiffs' Request for Admissions. Accordingly, the court deems these facts admitted and conclusively established for the purposes of this litigation.

discriminatory provisions—requiring men to work longer than women to become eligible for equivalent benefits—which were held unlawful in *Fitzpatrick*. It is admitted, however, that even before the *Fitzpatrick* decision was announced, "an indeterminate number of male state employees believed that they would obtain, through legislative or judicial action, equal treatment with women under the state's retirement laws, *i.e.*, that the retirement ages and benefits applicable to women would be made available to them through a change in the laws." In any event, the *Fitzpatrick* decision changed the law to enable men to retire on the terms formerly applicable only to women, and between September 1974 and June 1975 both prospective male employees and men already in state service learned, either from pension benefit information disseminated by the state or from other sources, that the retirement ages and benefits applicable to men had, by virtue of this court's order, become identical to those applicable to women. The law upon which male members of the plaintiff class were relying just before the adoption of the 1975 Act was therefore the rule articulated by Judge Clarie in *Fitzpatrick*: men already in state service had the right to retire at the same ages and with the same levels of benefits as female state employees. *See Fitzpatrick v. Bitzer, supra*, 390 F.Supp. at 290.

### C. The 1975 Act

The 1975 Act amended the State Employees Retirement Act in a number of ways. As the plaintiffs contend, and the defendants concede,[21] the thrust of the amendments was to require certain employees, both male and female, to work as many as five years longer than they were required to work by prior law (*i.e.*, the State Employees Retirement Act, as modified by this court's decision in *Fitzpatrick*) in order to obtain the same level of pension benefits. The 1975 Act did not have this effect on all employees, for it contained a "grandfather clause"[22] which exempted from the more stringent age requirements for eligibility those employees who would reach, before June 30, 1980, the lower age threshold imposed by prior law; as a result of this provision, the 1975 Act affected only the plaintiffs and those who entered state service after June 30, 1975.

The specific statutory provisions which the plaintiffs challenge are the following:

(1) Amended Conn.Gen.Stat. §§ 5–162(c) and 5–162(d), which require an employee to reach the age of 55, if he or she has completed 25 years of state service, or the age of 60, if he or she has completed at least 10 but less than 25 years of state service, before retiring with benefits. Immediately prior to the enactment of these amended provisions, such employees could retire with benefits at ages 50 and 55, respectively. These subsections also establish benefit schedules which reduce the levels of retirement benefits that some members of the plaintiff class can expect.

(2) Amended Conn.Gen.Stat. § 5–163(c), which provides that an employee whose state service is terminated under certain conditions[23] is entitled to retirement benefits if he or she has completed 25 years of state service, but has not yet reached his or her 55th birthday. The applicable age for such an employee had been 50 under the law which had been enforced by the state immediately prior to the adoption of the 1975 Act.

(3) Amended Conn.Gen.Stat. § 5–166(a), which provides that an employee who leaves state service under certain conditions before becoming eligible for retirement with pen-

**21.** *See* Answer ¶ 4, admitting relevant portions of Amended Complaint ¶ 14.

**22.** Conn.Gen.Stat. § 5–163a.

**23.** Section 5–163(c), which is headed "[e]arly retirement," provides that an employee, not covered by Conn.Gen.Stat. § 5–163a, "whose state service is terminated because of economy, lack of work or abolition of his position, or who, being an army or air national guard technician in the military department, is dismissed by reason of separation from the national guard because of age, after he has completed twenty-five years of state service, but before he has reached his fifty-fifth birthday, shall be entitled to a retirement income."

sion benefits under other provisions of the statute [24] shall nonetheless be eligible for a pension on a reduced actuarial basis upon attaining the age of 55. Under the law as applied immediately prior to the enactment of the 1975 Act, such an employee was eligible for these benefits at age 50.

(4) Conn.Gen.Stat. § 5–163a, which permits any employee reaching either (a) the age of 50 and his or her 25th year of state service, or (b) the age of 55 and his or her 10th year of state service, prior to June 30, 1980 to retire with a pension at full benefit levels before that date. This provision protected these classes of state employees from the more stringent age qualifications embodied in other provisions of the 1975 Act, but left the members of the plaintiff class exposed to the more restrictive standards of the new law.

The effects of these provisions of the 1975 Act on the named individuals who represent the plaintiff class illustrate the types of injuries which the 1975 Act inflicts upon the plaintiffs' expectations.[25] For example, plaintiff Karen Pineman, who is now 44 years old, has been in continuous state service since January 16, 1956. Under former Conn.Gen.Stat. § 5–162(c)(1), which, as applied to female employees, was unaffected by Judge Clarie's 1974 order, she could have expected to retire with pension benefits at age 50—i.e., in 1986. The 1975 Act requires her to work an additional five years—until 1991—to receive benefits at the same levels.

Plaintiff Alphonse S. Marotta is in an analogous position. He is 45 years old and has been in continuous state service since June 20, 1955. Former Conn.Gen.Stat. § 5–162(c)(1) would have required him, solely as a consequence of his sex, to work until his 55th birthday in order to obtain the benefits due him as a 25 year veteran of continuous state service. However, the or-

der of this court in *Fitzpatrick*, which required the state to administer its retirement statute "so that men will be eligible to retire at age 50," changed the expectations of men in Mr. Marotta's position. After the court's order in *Fitzpatrick*, but before June 30, 1975 (the effective date of the 1975 Act), such male employees were permitted to retire with pension benefits at age 50. Indeed, the 1975 Act continued to allow retirement with full benefits at age 50 for employees who had served the state for 25 years and reached age 50 before June 30, 1980. Conn.Gen.Stat. § 5–163a. However, because Mr. Marotta will not reach age 50 until after June 30, 1980, under the 1975 Act he will have to wait until his 55th birthday, in 1990 (rather than his 50th birthday, in 1985), to retire with pension benefits.

Plaintiff Alfred K. Tyll is in a similar situation. He is 48 years old and will have completed 25 years of continuous state service by June 30, 1980. The 1975 Act requires him to work until age 55—i.e., 1987 —before he may retire with pension benefits; the law in effect after *Fitzpatrick* but before the 1975 Act would have permitted his retirement with full benefits in 1982, when he turns 50. Under the 1975 Act, Mr. Tyll is eligible for full retirement benefits only after working five years longer than he would have been required to work under prior law.

The 1975 Act forces some employees to choose between working longer than previous law would have required in order to receive retirement benefits at the levels they expected and retiring prematurely with retirement income calculated at lower benefit levels. For example, plaintiff Daniel Clifford, who is 47 years old and began state service on September 15, 1959, would have been entitled to a full pension in 1984 (after 25 years of service) but for the 1975

---

**24.** Section 5–166 applies to employees who leave state service before they become eligible for retirement, "but after completing at least ten years of state service, of which at least five years shall have immediately preceded the date of . . . leaving state service," unless they

are covered by Conn.Gen.Stat. § 5–163a. Conn.Gen.Stat. § 5–166(a).

**25.** The facts relating to the named plaintiffs are drawn from ¶¶ 15–21 of the plaintiffs' Amended Complaint, which are admitted in ¶ 3 of the defendants' Answer.

Act. However, its provisions require him either to work until 1988, when he reaches the age of 55 and thereby qualifies for retirement with full pension benefits, or to retire before that time with vested retirement income on a reduced actuarial basis, pursuant to amended Conn.Gen.Stat. § 5–166(a). If he chooses the latter option, Mr. Clifford will receive something less than the full pension benefits at age 50 which he would have obtained had the 1975 Act's retroactive provisions not become law. Plaintiff Judith Narus is put to the same choice by the 1975 Act; she may either work longer than prior law required to receive benefits at the usual full pension levels, or retire before reaching her 55th birthday and accept benefits calculated at a lower level.

Finally, the practical effect of the 1975 Act is to reduce the benefits of some plaintiffs who have served the state for less than 25 years, pursuant to the benefit schedule set forth in amended section 5–162(d). For example, under prior law, plaintiff Rose Schewe, who will have completed fifteen years of state service on September 10, 1980, would have received monthly benefits including 2.5% of her earnings in excess of the amount on which the state made Social Security contributions, multiplied by her years of service. However, under the 1975 Act, this component of her benefits will be calculated on the basis of a 2.0% multiplier for "excess earnings" if she retires after reaching age 65, but before her 70th birthday. Only if she continues to work until she reaches age 70 will Ms. Schewe become eligible, under the 1975 Act, to receive benefits calculated at the 2.5% rate to which she would formerly have been entitled at age 65.

### D. The Legislative History of the 1975 Act

The 1975 Act had its origins in House Bill 5176, which was introduced on the floor of the Connecticut House of Representatives on June 3, 1975. *See General Assembly Proceedings 1975: House of Representatives* 6342–43. The original version of this bill would have raised the retirement age only for those who would become state employees after June 30, 1975. It did not purport to have any retroactive effect. The bill was, however, amended on the floor to provide that one group of employees already in state service—the members of the plaintiff class—would, along with future generations of state employees, be subject to the more stringent age qualifications for pension eligibility. In the words of the amendment's sponsor, "[t]his amendment restores males who are under age 45 to the [age] 55 retirement that was in effect before the recent Court decision, and it establishe[s] age 55 for females who are presently under age 45." *Id.* at 6346 (remarks of Rep. Wright).

After brief debate, the House passed the bill, as amended. *Id.* at 6362. The next day, the Senate passed the bill in the same form. *General Assembly Proceedings 1975: Senate* 3590. Neither the House of Representatives nor the Senate held public hearings on the legislation which became the 1975 Act. *See id.* at 3582 (remarks of Sen. Rome).

Although there are no formal reports explaining the legislature's purpose in passing the 1975 Act, it is clear from the debates in both houses that the General Assembly was reacting to the decision in *Fitzpatrick* with a view toward achieving two related objectives: (1) putting an end to Connecticut's policy of permitting certain state employees to retire with pension benefits at age 50, which many legislators believed to be an unduly early retirement age, and (2) saving money by reducing the expenses which the state incurs to fund its share of the State Employees Retirement System.

On the House floor, the amended bill's sponsor, Representative Wright, brought these two aims of the legislation into sharp focus. Condemning past Connecticut policy which allowed some state employees to retire at age 50, he said: "I don't think there is any other state or probably any municipality that has a retirement age that allows employees to retire at age 50 and receive 50% of their pay. This is far more liberal than is provided in [sic] any public

employer, and one that I think if we don't correct it can bankrupt the State of Connecticut." *General Assembly Proceedings 1975: House of Representatives* 6346. Citing a report which estimated that the amended bill would save between $3,000,000 and $5,000,000 in 1975–76, Representative Wright added, "I'm sure the House will be able to find a place to use that three to five million dollars, should this amendment pass." *Id.* Another proponent of the amended bill, Representative Dice, stated:

"[T]here are very few, if any, retirement plans where you can retire at age 50. The only one that I know is the military service, and I hope our state employees are not equivalent to being in the military service, where they would have to go overseas to that extent."

*Id.* at 6347–48. Representative Dice added that Connecticut faced the risk of bankruptcy if it did not reduce its pension obligations, comparing the situation to that of New York City. *Id.* at 6348. Representative Mannix offered a similar assessment of the situation:

"Most, if not all, of the taxpayers who have a retirement plan in the State of Connecticut can normally retire at age 60. They're being asked by us and the government of the State to underwrite a retirement plan at age 50. To me, this is inexcusable. Something's got to be done. If we continue on this way, as has been pointed out, we're going to end up in bankruptcy."

*Id.* at 6348.

The day after the amended bill cleared the House, the Senate took up the measure. The remarks made by the bill's supporters in the upper chamber paralleled those made by its advocates in the House. Senator Hennessey expressed the view that "we're just trying to straighten out a Court decision." *General Assembly Proceedings 1975:*

*Senate* 3579. The thrust of the position of the bill's supporters was that "50 years of age is an unreasonable age for retirement," *id.* at 3578 (remarks of Sen. Amenta); *see also id.* at 3582 (remarks of Sen. Fauliso); *id.* at 3588 (remarks of Sen. Ciarlone), and that the bill would save Connecticut $3,600,000 in the next fiscal year alone, see *id.* at 3575 (remarks of Sen. Baker); *id.* at 3586–87 (remarks of Sen. Houley). A study prepared by the actuary of the pension fund was reported to have established that, in fiscal year 1975–76, the state would save $800,000 by prospectively raising the retirement age for new employees, and another $2,800,000 by extending that provision to those persons already in the state's employ who would not be eligible to retire with pension benefits under after June 30, 1980—*i.e.*, the plaintiffs in this action. *Id.* at 3587 (remarks of Senator Houley). As Senator Houley noted, enacting the amended bill would permit the state to start realizing savings on its appropriations for the State Employees Retirement Fund in the very fiscal year for which the legislature had just passed a budget. *Id.*

### III. THE PLAINTIFFS' CLAIMS

The plaintiffs' principal contention is that the 1975 Act operates to impair the state's contractual obligations to them, in violation of the contract clause of the United States Constitution.[26] They seek a declaratory judgment establishing that the 1975 Act, as applied to the plaintiff class, is unconstitutional, as well as injunctive relief requiring the defendants to administer the State Employees Retirement Act, insofar as it applies to the plaintiffs, without regard to the provisions of the 1975 Act. They do not challenge the constitutionality of the prospective application of the 1975 Act to those who became state employees after June 30, 1975.

---

**26.** The plaintiffs also allege that the 1975 Act violates their rights under the due process and equal protection clauses of the Fourteenth Amendment. However, these points were neither emphasized in the parties' briefs nor stressed at oral argument. *See* Transcript of Oral Argument on Plaintiffs' Motion for Sum-

mary Judgment, Feb. 7, 1980, p. 4. In view of the court's conclusion that the plaintiffs' rights under the contract clause were violated by the 1975 Act, it is unnecessary to consider the merits of the Fourteenth Amendment claims which the plaintiffs have not pressed.

The plaintiffs would require the state to permit them to retire with full pension rights (a) upon completion of 25 years of continuous state service, at age 50; and (b) upon completion of at least 10, but less than 25, years of continuous state service, at age 55. In addition, the terms of retirement and the benefit levels for which the plaintiffs would be eligible would be those which were applied to all state employees retiring in the period after this court's *Fitzpatrick* decision, but prior to the 1975 Act. These are the same terms and benefits which the state—consistently with Title VII—afforded all employees, regardless of sex, immediately after the *Fitzpatrick* decision, and which were preserved by the 1975 Act for those employees covered by its "grandfather clause," Conn.Gen.Stat. § 5–163a.

## IV. THE CONTRACT CLAUSE OF THE UNITED STATES CONSTITUTION

*A. Introduction*

■ The constitutional provision invoked by the plaintiffs reads simply: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S.Const. art. I, § 10, cl. 1. However, the analysis of a contract clause challenge to state legislation is anything but simple. While the language of the Constitution is, on its face, absolute, a substantial body of Supreme Court cases demonstrates that the contract clause does not prohibit every impairment by a state of contractual obligations. *See, e. g., El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965); *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78

L.Ed. 413 (1934).[27] Nonetheless, the Supreme Court has recently reminded us that the contract clause "is not a dead letter," *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978), and that it requires particularly careful examination of state legislation which impairs a contract to which the state itself is a party, *id.* at 244 n.15, 98 S.Ct. at 2722 n.15; *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22–23, 25–26, 97 S.Ct. 1505, 1517–1518, 1519, 52 L.Ed.2d 92 (1977).

In *United States Trust Co.,* the Court, in an opinion by Justice Blackmun, reaffirmed the continuing vitality of the contract clause in modern constitutional law:

"Both [*Home Building & Loan Association v. Blaisdell* and *El Paso v. Simmons, supra*] eschewed a rigid application of the Contract Clause to invalidate state legislation. Yet neither indicated that the Contract Clause was without meaning in modern constitutional jurisprudence, or that its limitation on state power was illusory. Whether or not the protection of contract rights comports with current views of wise public policy, the Contract Clause remains a part of our written Constitution."

431 U.S. at 16, 97 S.Ct. at 1514.

In *United States Trust Co.,* as here, the question was whether a state law violated the contract clause by impairing a state's own contractual obligations to private parties. At issue there was the constitutionality of a 1974 New Jersey statute which, together with an identically worded New York statute, repealed a 1962 covenant (itself embodied in legislation enacted by both

---

**27.** In *El Paso,* the Court upheld a Texas statute which limited the reinstatement rights of those who had purchased land from the state and had defaulted on their interest payments by requiring that such persons make application for reinstatement within five years of default; prior law included no such statute of limitations. Rejecting the argument that the contract clause forbade such legislation, the Court held that "it is not every modification of a contractual promise that impairs the obligation of contract under federal law . . . ." *El Paso v. Simmons, supra,* 379 U.S. at 506–07, 85 S.Ct. at 582.

In *Blaisdell,* the Supreme Court upheld against a contract clause challenge a temporary mortgage moratorium enacted by the Minnesota legislature in the depths of the Great Depression. The Court gave effect to the "principle of harmonizing the constitutional prohibition with the necessary residuum of state power," 290 U.S. at 435, 54 S.Ct. at 239, to deal with a grave economic crisis by holding that, in the circumstances presented, the limited impairment of contractual obligations caused by the mortgage moratorium was constitutionally permissible.

states) limiting the ability of the bi-state Port Authority of New York and New Jersey to use its revenues and reserves to subsidize unprofitable rail passenger transportation between the two states. The plaintiff, a New York bank, was a substantial holder of Port Authority bonds subject to the covenant and was a trustee for two series of such bonds.

The Court in *United States Trust Co.* held that the retroactive appeal of the 1962 covenant was an unjustifiable impairment of the state's contractual obligations to the plaintiff, in violation of the contract clause. Citing such venerable authority as *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137–39, 3 L.Ed. 162 (1810) and *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), the Court observed that "[i]t long has been established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties." *United States Trust Co. v. New Jersey, supra*, 431 U.S. at 17, 97 S.Ct. at 1515. At the same time, the Court noted, "the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *Id.* (footnote omitted).

■ Where, as here, it is claimed that the contract clause prohibits a state's statutory modification of its own obligations, the court must determine whether contractual obligations within the purview of the contract clause exist; if so, whether the state legislation under attack impaired those obligations; and if there is an impairment of contract, whether it is forbidden by the Constitution. *See generally United States Trust Co. v. New Jersey, supra*, 431 U.S. at 21–32, 97 S.Ct. at 1517–1522.

### B. Connecticut's Contractual Obligations to the Plaintiffs

■ A statute gives rise to a contractual obligation which is subject to the contract clause "when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *Unit-*

*ed States Trust Co. v. New Jersey, supra*, 431 U.S. at 17 n. 14, 97 S.Ct. at 1515 n. 14. In its inquiry into the existence of a contract within the meaning of the contract clause, a federal court must "accord respectful consideration and great weight" to relevant state law, *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685 (1938), although it is not bound by the state's law of contracts. *Irving Trust Co. v. Day*, 314 U.S. 556, 561, 62 S.Ct. 398, 401, 86 L.Ed. 452 (1942). *See generally* Hale, *The Supreme Court and the Contract Clause: III*, 57 Harv.L.Rev. 852, 852–72 (1944). Accordingly, the appropriate starting point for this court's examination of the question whether Connecticut's State Employees Retirement Act created contractual obligations to state employees is the common law of the State of Connecticut.

#### 1. Contractual Obligations in Pension Plans Under Connecticut Law

■ In the leading case of *Bird v. Connecticut Power Co.*, 144 Conn. 456, 133 A.2d 894 (1957), the Connecticut Supreme Court of Errors held that a non-contributory pension plan in which employees were not required to participate created contractual rights enforceable against a private employer. In *Bird*, the court rejected, in no uncertain terms, the employer's argument that, as a matter of law, it had complete discretion to modify its employees' expectations of pension benefits:

"A board of directors cannot legally strip an employee of the benefits of a pension plan where the employee has complied with the terms of the offer of a pension, since the purposes of the plan could be readily frustrated at the whim of the directors. . . . Even where an employer declares the plan is within the absolute discretion of the directors, the court will interpret the plan as a whole so as to give effect to its general purpose in securing the loyalty and continued service of the employees, and the employer may not defeat the employees' reasonable expectations of recovering the promised reward. . . . "

*Bird v. Connecticut Power Co., supra,* 144 Conn. at 463, 133 A.2d at 897 (citations omitted).

In *Wyper v. Providence Washington Insurance Co.,* 533 F.2d 57 (2d Cir. 1976), the court affirmed a decision by Judge Blumenfeld of this court, following *Bird* and holding that under Connecticut law, "a pension plan creates contractual rights and . . . court review may not be defeated through reservation of discretionary powers in the pension board." *Id.* at 63 (footnote omitted). In *Wyper,* which, like *Bird,* involved a private employer's pension plan, Judge Gurfein reiterated the contractual nature of pension rights under Connecticut law:

> "Later Connecticut opinions citing *Bird* treat it only as establishing that informal pension plans give rise to contractual rights which cannot be defeated by assertion of discretionary power, and we agree. *See Borden v. Skinner Chuck Co.,* 21 Conn.Supp. 184, 150 A.2d 607, 610 ([Super.Ct. Hartford Cty.] 1958); *Ellis v. Emhart Mfg. Co.,* 150 Conn. 501, 191 A.2d 546, 549 (1963)."

533 F.2d at 63 n.9.

If an "informal" pension plan in which employees are not required to participate and to which they contribute nothing of pecuniary value creates a binding contract, it would seem to follow, *a fortiori,* that a highly structured and formal pension plan—like the State Employees Retirement System—in which the employees must participate and into which they must make

monetary contributions gives rise to obligations and rights which are contractual in nature. Further examination of relevant Connecticut cases confirms this impression and strongly suggests that the rationale of *Bird, Wyper* and the cases cited therein applies with equal force to the facts of this case.

In *Bird,* the court emphasized that the employee "gave up other opportunities for employment because of the security he felt the pension benefits of the defendants afforded him." *Bird v. Connecticut Power Co., supra,* 144 Conn. at 462, 133 A.2d at 897. Indeed, the very purpose of the defendants' offer of a pension was to induce the plaintiff to act as he did; "securing the loyalty and continued service of the employees" was the employer's goal in offering pension benefits. *Id.,* 144 Conn. at 463, 133 A.2d at 897.[28] Similarly, in *Borden v. Skinner Chuck Co., supra,* the Superior Court, following *Bird,* stressed that the offer of a pension-like "bonus" may act not only as an inducement for a prospective employee to accept the offered position, but also as an incentive for one already in the employer's service to remain in his or her job. If the effect of such a promise is "to induce the employee to refrain from quitting, and in reliance thereon he does refrain, then there is sufficient consideration to support an enforceable contract." *Borden v. Skinner Chuck Co., supra,* 21 Conn.Supp. at 190, 150 A.2d at 610.[29]

---

**28.** In another context, the Supreme Court of the United States recently made a similar observation:

> "A pension plan assures employees that by devoting a large portion of their working years to a single employer, they will achieve some financial security in their years of retirement. By rewarding lengthy service, a plan may reduce employee turnover and training costs and help an employer secure the benefits of a stable work force."

*Alabama Power Co. v. Davis,* 431 U.S. 581, 594, 97 S.Ct. 2002, 2009, 52 L.Ed.2d 595 (1977) (holding that the Military Selective Service Act of 1967 required an employer to grant a veteran returning from military service credit toward his pension for time spent in the military).

**29.** As the court noted in *Borden v. Skinner Chuck Co., supra,* 21 Conn.Supp. at 190, 150 A.2d at 610, this principle was applied in Connecticut as early as *Tilbert v. Eagle Lock Co.,* 116 Conn. 357, 361–62, 165 A. 205, 207 (1933), a case involving employee death benefits. In *Tilbert,* a widow brought an action to recover benefits under a "certificate of benefit" issued to her late husband by his employer. The Supreme Court of Errors held that the plaintiff stated a good cause of action under Connecticut's law of contracts, even though the employer, in a contemporaneous document explaining its offer of the "certificate of benefit," expressly stated that "[t]his benefit plan being voluntary on the part of Eagle Lock Co., it is understood that it constituted no contract with any Employee or any beneficiary, and confers no legal rights on him or them," 116 Conn. at 360,

In *Bird* and its progeny, the Connecticut courts held that an employee who relies upon an offer of deferred benefits to his or her detriment, and to the benefit of the employer who gains the employee's valuable services and loyalty as a consequence thereof, has expectations which are protected by the law of contracts. The facts in the case at bar demonstrate the existence of precisely this type of reliance. The state has admitted that the plaintiff class consists entirely of persons who either accepted state employment, eschewing otherwise more lucrative job opportunities to work for Connecticut, in reliance upon the promises of pensions contained in pre-1975 law, or who remained in state service, foregoing other employment opportunities, in reliance upon the law as modified by Judge Clarie's decision in *Fitzpatrick*. Under the logic of *Bird* and similar cases decided under Connecticut law, the plaintiffs' relationships with the state with respect to their expected pensions are contractual in nature.

This conclusion is confirmed by the application of basic and long-standing principles of contract law to the admitted facts of the instant case. The common law of contracts clearly protects, in various contexts, the type of reliance interest which, the defendants concede, the plaintiffs possessed prior to the enactment of the 1975 Act. *See, e.g., Fisk v. Police Jury of Jefferson*, 116 U.S. 131, 133–34, 6 S.Ct. 329, 330, 29 L.Ed. 587

(1885) (implied contract theory protects reliance interest of public officer who performs services on the basis of a promise of a salary level embodied in legislation); *Restatement (Second) of Contracts* §§ 90 (Tent. Draft No. 2, 1965), 45 (Tent. Draft No. 1, 1964).[30] *See generally* 1A *Corbin on Contracts* §§ 193–207 (1963 ed.); Fuller & Perdue, *The Reliance Interest in Contract Damages*, 46 Yale L.J. 52, 337 (1936–37).

Indeed, the courts of Connecticut have been in the forefront of this common law development, conferring the protection of the law of contracts on the reliance interests of promisees in positions like those of the plaintiffs here even before the first *Restatement of Contracts* was published. In *State ex rel. Marsh v. Lum*, 95 Conn. 199, 111 A. 190 (1920), the Supreme Court of Errors held that teachers who were promised a salary increase by a school board, and who relied in silence upon that promise, forbearing from exercising their options to leave their jobs, had a contractual right to the increase in pay. In the court's words, the teachers "gave up something that was legally theirs, and the town has received the benefit of their surrender." *State ex rel. Marsh v. Lum, supra*, 95 Conn. at 204, 111 A. at 192. This, the court held, brought the teachers' case within the rule of *Rice v. Almy*, 32 Conn. 297, 304 (1864):

165 A. at 207. The court found that there was consideration for the supposedly gratuitous offer of a death benefit, explaining:

"[A] prime purpose of the granting of the benefits was to secure the good will, loyalty, and efficiency of the defendant's employees and especially, through the progressive premium placed on long-continued service, to minimize labor turn-over and obtain the advantages of experienced operatives. The attainment of these purposes constituted a benefit or advantage received by the defendant, who must be assumed to have requested it because it desired it and regarded it as beneficial to its interests. Tilbert remained in the employ of the defendant more than seven years after receiving the certificate. By so doing he manifested his acceptance of the promise, forbore his right to terminate his employment and engage elsewhere, and conferred the benefit which the defendant

sought. . . . The essentials of a consideration are satisfied. . . ."
116 Conn. at 361–62, 165 A. at 207 (citations omitted).

**30.** Section 90 of the Second *Restatement* provides, in pertinent part:

§ 90. *Promise Reasonably Inducing Action or Forbearance*
A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise. . . .

Section 45 of the Second *Restatement* protects the reliance interest of promisees under certain circumstances by providing that "[w]here an offeror invites an offeree to accept by rendering a performance" only, an enforceable option contract is created upon the beginning of the promisee's performance.

"[I]f a man by a promise induces the promisee . . . to do some act or part with some chattel, title, interest, privilege, or right, which the law regards as of some value, there is sufficient consideration for the promise."

*State ex rel. Marsh v. Lum, supra,* 95 Conn. at 204, 111 A. at 192. *See also Tilbert v. Eagle Lock Co.,* 116 Conn. 357, 361–62, 165 A. 205, 207 (1933). As in *Marsh,* the plaintiffs' forbearance, which in this case was induced by the state's offer of pension benefits on the terms in effect prior to the 1975 Act, constitutes consideration—even apart from the plaintiffs' contributions to the State Employees Retirement Fund—for the state's promise.

The contributions which the plaintiffs have made to the State Employees Retirement Fund since becoming state employees further support the conclusion that their relationships with the state are contractual in nature. Standing alone, these payments, which are required as a condition of entering and remaining in state service, constitute consideration under Connecticut law. *See, e. g., Osborne v. Locke Steel Chain Co.,* 153 Conn. 527, 531, 218 A.2d 526, 529 (1966) (defining consideration as "a benefit to the party promising, or a loss or detriment to the party to whom the promise is made"); *Finlay v. Swirsky,* 103 Conn. 624, 631, 131 A. 420, 423 (1925) (same). This conclusion is in no way affected by the fact that the contributions of employees comprise but a fraction—albeit a substantial one [31]—of the benefits paid out of the retirement fund, for the size of the benefit or detriment which constitutes consideration is irrelevant under Connecticut law. *See Osborne v. Locke Steel Chain Co., supra,* 153 Conn. at 532, 218 A.2d at 530; *Clark v. Sigourney,* 17

Conn. 511, 517 (1846); *see generally* 1 *Corbin on Contracts* § 127 (1963 ed.). Indeed, courts in other jurisdictions have held that the fact that a public employee must make contributions to a pension fund compels a finding that his or her expectations are enforceable contract rights, not mere gratuities. *See, e. g., Campbell v. Judges' Retirement Board,* 378 Mich. 169, 179–80, 143 N.W.2d 755, 757 (1966) (state court judges' pensions); *Hickey v. Pension Board,* 378 Pa. 300, 305–07, 106 A.2d 233, 235–36 (1954) (city employees' pensions).

*2. Mere "Gratuities" or Contractual Rights?*

Not surprisingly, the defendants do not question the plaintiffs' strong reliance interest or the existence of consideration sufficient to support a contract. Nor do they dispute that under Connecticut law the plaintiffs would possess enforceable contractual rights if this case arose in the context of a private employer's pension plan. Rather, the defendants' principal argument is that because the state is their employer, the plaintiffs possess mere "gratuities" offered them by a sovereign, rather than rights conferred by contract law.[32] This proposition is, however, supported neither by Connecticut precedent nor logic.

No Connecticut court has been called upon to consider whether a public employee's expectation of pension benefits, like that of the private employee in *Bird,* is contractual in nature. The only indication that it is possible that the *Bird* rule might not apply to the case at bar is to be found in ambiguous dicta in an opinion of the Supreme Court of Errors written fifteen years prior to *Bird.* In *State ex rel. Kirby*

---

**31.** An employee's contributions, together with the interest accrued on them, account for up to one quarter of the benefits paid to employees. *See* p. 530 & n.14, *supra.*

**32.** The defendants' alternative argument is that the legislature's enactment in 1975 of a collective bargaining law for state employees, Conn. Gen.Stat. § 5–270 *et seq.,* somehow negates the existence of any contracts with state employees prior to October 1, 1975, its effective date. *See* Brief in Opposition to Plaintiffs' Motion for

Summary Judgment, pp. 1–3. While the collective bargaining law provides for a type of contract between the state and its employees, it does not purport to act retroactively and turn all of the state's contracts with employees, previously made, into something less than contracts. The court therefore sees no connection between the collective bargaining legislation of 1975 and the issue of whether previous legislation gave rise to contractual obligations.

*v. Board of Fire Commissioners*, 129 Conn. 419, 29 A.2d 452 (1942), the court affirmed a judgment for a retired Hartford fireman who sought a pension which was provided for by the city charter, but which the board administering the pension plan declined to award him. In rejecting one of the board's arguments, the court wrote:

"The defendants further contend that the plaintiff had no vested right to retirement but that his retirement lay in the discretion of the board. *It may be true that under retirement acts generally even where the person eligible for retirement has contributed by way of dues or assessments to make up the retirement fund he has no vested right to retirement.* That does not mean, however, that a charter provision granting retirement rights may be overridden by a municipal board so as to deprive an employee of *his right to retirement as fixed by the charter.* . . ."

*State ex rel. Kirby v. Board of Fire Commissioners, supra,* 129 Conn. at 426, 29 A.2d at 455–56 (emphasis added) (citation omitted).

Insofar as it might be relevant here, this language is inconclusive. On the one hand, the court suggested that "it may be true," as a general proposition, that no contractual rights arise from statutory employee pension plans. On the other hand, the court found that the city charter granted the plaintiff "his right to retirement" with the benefits promised by the city; this implies that, at least in some unspecified circumstances, public employees may have contractual rights to pensions provided by law.

To the limited extent that the ambiguous *Kirby* dicta do appear to support the defendants' argument that a state pension is merely a "gratuity," such language is of highly uncertain precedential value after *Bird v. Connecticut Power Co., supra.* The contention of the defendants in *Kirby* that a pension board has complete discretion to deprive an employee of the pension which he expected under the terms of the board's earlier offer was not squarely addressed by the court in that case. However, this notion was expressly rejected, at least as applied to the private sector, in *Bird,* where the court gave no indication that its holding should be limited to cases involving private employers' pension offers. *See Bird v. Connecticut Power Co., supra,* 144 Conn. at 463, 133 A.2d at 897.

In the absence of Connecticut precedent which is directly on point, the defendants urge that the *Bird* rule should not be applied to this case, and instead refer the court to a line of cases from other jurisdictions which hold that public employees' pensions are "gratuities."[33] However, the court finds the logic of these cases to be anything but compelling. To follow these

---

**33.** *See* Brief in Opposition to Plaintiffs' Motion for Summary Judgment, pp. 3–5. *Cf. Pennie v. Reis,* 132 U.S. 464, 471, 10 S.Ct. 149, 151, 33 L.Ed. 426 (1889) (interest of police officer in employee benefit fund was "a mere expectancy, created by the law, and [is] liable to be revoked or destroyed by the same authority" until the happening of the conditions established by law). Among the cases upon which the defendants rely for the proposition that public employees' pensions are mere gratuities, conferring no contractual rights, is *Board of Trustees v. People ex rel. Behrman,* 119 Colo. 301, 203 P.2d 490 (1949). *Behrman* was, however, expressly overruled on this point in *Police Pension & Relief Board v. McPhail,* 139 Colo. 330, 344, 338 P.2d 694, 701 (1959). For more than twenty years, Colorado courts have thus held that public employees' pension expectations are contractual in nature. *See also Police Pension & Relief Board v. Bills,* 148 Colo. 383, 388–89, 366 P.2d 581, 583–84 (1961).

Among the other cases containing classic statements of the "gratuity" theory of public employees' pension benefits, and relied upon by the defendants, are *Dodge v. Board of Education,* 302 U.S. 74, 80–81, 58 S.Ct. 98, 101, 82 L.Ed. 57 (1937) (Illinois law) and *MacLeod v. Fernandez,* 101 F.2d 20, 23–26 (1st Cir. 1938), *cert. denied,* 308 U.S. 561, 60 S.Ct. 72, 84 L.Ed. 471 (1939) (Puerto Rico law). It should be noted that by constitutional amendment, Ill. Const. art. 13, § 5, adopted in 1970, Illinois declared the pension rights of public employees to be contractual, while Puerto Rico cases decided since *MacLeod* cast some doubt on its continued vitality in that jurisdiction. *See Maldonado v. Superior Court,* 100 P.R.R. 369 (1972); *Lopez v. Munoz,* 80 P.R.R. 4, 10 n.6 (1957); *Treasurer v. Tax Court,* 73 P.R.R. 830 (1952).

authorities would require the court to hold that a pension is a "gratuity" if offered by the state, even though the same pension would undoubtedly give rise to contractual rights under Connecticut law if it were offered by a private employer under like circumstances. In support of this distinction, the defendants rely entirely on the fact that the state, unlike a private employer, possesses attributes of sovereignty.

While Connecticut's sovereignty is undeniable, so is its ability to enter into binding contracts to procure the services which it requires to function on a daily basis. *See United States Trust Co. v. New Jersey, supra,* 431 U.S. at 24, 97 S.Ct. at 1519 (a state's "power to enter into effective financial contracts cannot be questioned"). The fact that in our constitutional system, the state possesses a measure of sovereignty in no way supports the conclusion that its offer of pension benefits to its employees is gratuitous rather than contractual. *See* Cohn, *Public Employee Retirement Plans— The Nature of the Employees' Rights,* 1968 U. of Ill.L.Forum 32, 37.

Another difficulty with the notion that the pensions offered by Connecticut are "gratuities" is to be found in the state's own constitution. Article 11, section 2 of the Connecticut Constitution provides:

§ 2. *Extra compensation to public officers prohibited*

Neither the general assembly nor any county, city, borough, town or school district shall have power to pay or grant any extra compensation to any public officer, employee, agent or servant, or increase the compensation of any public officer or employee, to take effect during the continuance in office of any person whose salary might be increased thereby, or increase the pay or compensation of any public contractor above the amount specified in the contract.

This provision, which dates to the nineteenth century,[34] prohibits the legislature from bestowing "extra compensation" or gratuities on the state's employees. "[T]he purpose of the article [is] to take from the public bodies therein mentioned . . . the power to make gratuitous compensation to public officers and employees in addition to that which is established by law or contract . . . ." *Sullivan v. City of Bridgeport,* 81 Conn. 660, 665, 71 A. 906, 907 (1909) (ordinance increasing police officers' salaries did not confer an unconstitutional gratuity). *See also State ex rel. Marsh v. Lum, supra,* 95 Conn. at 205–206, 111 A. at 192 (school board's grant of a pay increase to teachers was a contract, not a gratuity barred by the state constitution); *McGovern v. Mitchell,* 78 Conn. 536, 569, 63 A. 433, 446 (1906).

Through Article 11, section 2, the sovereign people of Connecticut expressly denied the legislature the power to make gratuitous payments to state employees—the very power which the defendants now misguidedly argue the legislature exercised when it passed the State Employees Retirement Act. The court declines to find that the General Assembly exceeded its constitutional authority when, in 1939, it enacted the state's comprehensive public employee retirement laws.[35] Rather, the court concludes that the State Employees Retirement Act was in fact designed to achieve the proper legislative purpose of providing a form of deferred compensation to qualified state employees as an incentive for them to enter into, and remain in, state service. *See Alcorn ex rel. Hyde v. Dowe,* 10 Conn.Supp. 346, 350 (Super.Ct. Hartford Cty.), *rev'd on other grounds sub nom. State ex rel. Hyde v. Dowe,* 129 Conn. 266, 28 A.2d 12 (1942) ("the fundamental theory of the Act is that those who have rendered

---

**34.** Article 11, section 2 of the Constitution of 1965 is, with the exception of two deleted commas, identical to Article XXIV of the Amendments to the Constitution of 1818, adopted in 1877.

**35.** In *Yeazell v. Copins,* 98 Ariz. 109, 112, 402 P.2d 541, 543 (1965), the court held that Arizo-

na's statutory provisions for public employees' pensions were contractual in nature. The court rejected the argument that the pension benefits .were gratuities, in part because the Arizona legislature, like Connecticut's, was constitutionally forbidden from conferring gratuities on state employees.

long and faithful service to the State shall be compensated after they retire").

Because Connecticut's sovereignty does not compel a finding that the nature of the plaintiffs' expectations differs from those of similarly situated employees in the private sector in any legally significant way, the court finds the *Bird* rationale applicable to the case at bar. This result is supported by the trend of cases in other states holding that, at least where employees contribute to the pension fund (as Connecticut's employees are required to do), a public pension plan is not a gratuity, but rather gives rise to binding contractual rights and obligations.[36] *See, e. g., In re State Employees' Pension Plan*, 364 A.2d 1228 (Del.1976); *Miles v. Tennessee Consolidated Retirement System*, 548 S.W.2d 299 (Tenn.1976); *Pyle v. Webb*, 253 Ark. 940, 489 S.W.2d 796 (1973); *Sylvestre v. State*, 298 Minn. 142, 214 N.W.2d 658 (1973); *Smith v. City of Dothan*, 279 Ala. 571, 188 So.2d 532 (1966); *Yeazell v. Copins*, 98 Ariz. 109, 402 P.2d 541 (1965); *Police Pension & Relief Board v. Bills*, 148 Colo. 383, 366 P.2d 581 (1961); *State Teachers' Retirement Board v. Giessel*, 12 Wis.2d 5, 106 N.W.2d 301 (1960); *Eisenbacher v. City of Tacoma*, 53 Wash.2d 280, 333 P.2d 642 (1958); *Wright v. Retirement Board*, 390 Pa. 75, 134 A.2d 231 (1957); *Wallace v. City of Fresno*, 42 Cal.2d 180, 265 P.2d 884 (1954); *Tait v. Freeman*, 74 S.D. 620, 57 N.W.2d 520 (1953); *Payne v. Board of Trustees*, 76 N.D. 278, 35 N.W.2d 553 (1948).

The numerous courts which have rejected the archaic notion that public employees' pensions are merely gratuities which may be revoked or significantly modified at the whim of the legislature have recognized that one who is offered a pension by the state as an inducement to join and remain in the state's employ is in precisely the same position as one, such as the plaintiff in *Bird*, who is offered a similar pension for the same reasons by a private employer. In both instances, the offered pension is a form of deferred compensation upon which the employee makes his or her decision to accept and continue in a job. *See Wright v. Retirement Board, supra*, 390 Pa. at 79, 134 A.2d at 233. In both cases, the employer and employee each give up something of value: the employer makes a promise to pay compensation in the future, and the employee forbears from accepting other employment. In both cases, each obtains something of value: the employee gains an expectation of deferred compensation upon retirement, while the employer receives valuable services and, perhaps, a measure of loyalty from the employee. *See Yeazell v. Copins, supra*, 98 Ariz. at 114–15, 402 P.2d at 543.

The contractual nature of modern contributory public employee pension plans, and their similarity to private pension plans, was placed in historical perspective by the Supreme Court of Delaware in holding that the "gratuity" doctrine no longer comports with modern realities:

**36.** As long ago as 1956, a commentator who surveyed this field of law observed that "the tendency today is to consider a pension plan a contract," and to reject "the gratuity theory of pensions." Note, *Contractual Aspects of Pension Plan Modification*, 56 Colum.L.Rev. 251, 255 (1956). In addition to the states whose courts have rejected the "gratuity" concept, several states, of which New York was the first, have adopted constitutional provisions declaring public employees' pensions benefits to be contractual in nature. *See* N.Y.Const. art. V, § 7 ("membership in any pension or retirement system of the state or a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired"); Alaska Const. art. XII, § 7; Hawaii Const. art. XIV, § 2; Ill.Const. art. 13, § 5; Mich.Const. art. IX, § 24. In Massachusetts, a statute establishes as contractual the relationship between the state and members of its public employees' retirement system. Mass. Gen.L. ch. 32, § 25(5). The fact that, in other jurisdictions, prior case law based on the "gratuity" theory has been overruled by constitutional amendments or statutes is no impediment to this court's determination that Connecticut's common law of contracts requires a rejection of the "gratuity" theory. The inherent but unexercised power of a legislature or constitutional convention to discard an outmoded judge-made doctrine is no obstacle to a judicial decision that overrules such a doctrine, *see generally* B. Cardozo, *The Nature of the Judicial Process* 127–28, 134–38, 149–58 (1921), much less a bar to a decision—such as this one—which restates and interprets, rather than revises, the state's common law.

"Originally a pension was a gratuity usually offered to a retiring officer or executive of a company to show the company's appreciation for past services rendered. Those first pension systems were non-contributory and, although a person might have expected to receive a pension, the recipient usually did not accept employment or continue therein in reliance upon the expectation of a pension. As time and the nature of employment relationships passed, employers—*even governments*—found it necessary as a matter of competition to offer a pension plan benefit as an inducement for the hire or retention of employees. *Indeed, in today's economy, the terms and conditions of an employer's pension plan play an important role in inducing a man to enter or continue in the service of that employer. In other words, it is a part of the consideration for the contract of hire.*"

*Dorsey v. State ex rel. Mulrine*, 301 A.2d 516, 518 (Del.1972) (emphasis added). *See also Hickey v. Pension Board*, 378 Pa. 300, 304–05, 106 A.2d 233, 235–36 (1954).

As noted at greater length previously, the facts of this case demonstrate the contractual nature of the relationship between the state and the plaintiffs. Following the trend of better-reasoned modern cases from other jurisdictions, and consistently with Connecticut contract law and the rationale of the opinion of the Connecticut Supreme Court of Errors in *Bird*, the court holds that the enactment of the State Employees Retirement Act gave rise to contractual rights and obligations which are cognizable under the contract clause of the United States Constitution. In so holding, the court does not denigrate the sovereignty of the State of Connecticut. While the state's sovereignty is irrelevant to the existence of a contract, it is an important factor in determining whether any contractual obligation of the state has been unconstitutionally impaired. The court duly considers questions of state sovereignty in determining the constitutionality of the claimed impair-

ment of Connecticut's contractual obligations.[37]

### 3. The Content of the Plaintiffs' Contractual Rights and Connecticut's Obligations

■ The content of the plaintiffs' contractual rights and Connecticut's obligations, to the extent that they are affected by the 1975 Act, merits some consideration. The state is not, of course, contractually obligated to pay any employee pension benefits until he or she meets all the qualifications established by law, including completion of the requisite period of service and attainment of the requisite age. Therefore, members of the plaintiff class lack, as of this date, vested rights to receive pension benefits. This does not mean, however, that they are without rights protected by the law of contracts and the contract clause of the United States Constitution. Because of their reliance interest and the consideration which they have given for the state's offer of pension benefits, the plaintiffs have a contractual right to continued membership in the State Employees Retirement System under the terms for retirement ages and benefits prevailing immediately prior to the adoption of the 1975 Act. *See Wright v. Retirement Board, supra*, 390 Pa. at 79, 134 A.2d at 233; *Police Pension & Relief Board v. Bills, supra*, 148 Colo. at 390, 366 P.2d at 583 (although pension rights are only vested at the time of retirement, a "limited vesting" occurs upon commencement of employment, so that the pension plan, as it relates to those in state service, cannot be abolished or adversely affected in any substantial manner). *Cf. Restatement (Second) of Contracts* § 45 & Illustration 8 (Tent. Draft No. 2, 1965) (when unilateral option contract is offered, the offeree possesses a contractual right from the time he begins performance in reliance upon the offer).

■ The substance of the state's contractual obligations, and of the plaintiffs' corresponding rights, is not to be found in the

---

**37.** See pp. 547–548, *infra*.

bare words of the State Employees Retirement Act as it read prior to its 1975 amendment. Rather, this court must look to the statute as it was modified by the decision in *Fitzpatrick v. Bitzer.* Viewing the matter otherwise would in effect undo this court's holding in *Fitzpatrick,* as applied to the male plaintiffs, by restoring the effectiveness of the very discriminatory provisions of state law which violated Title VII.[38] As this court held in *Fitzpatrick,* Title VII requires that if the state obligates itself to grant women retirement rights at age 50 under certain conditions, it must grant men the same rights under the same conditions. *See Fitzpatrick v. Bitzer, supra,* 390 F.Supp. at 290. Because women in the plaintiff class could expect, under pre-1975 law, to retire with pensions at age 50 after 25 years of continuous state service, the court is constrained by Title VII and *Fitzpatrick* to hold that similarly situated males in the class had the same contractual expectations at the time the 1975 Act was adopted.

While this conclusion might at first seem to grant male plaintiffs greater rights than they had reason to expect, it is in fact consistent with the scope of their admitted reliance interest. After this court's decision in *Fitzpatrick,* in which the state acquiesced, Connecticut enforced the law in accordance with Judge Clarie's decision, permitting men to retire on the terms which previously had applied only to women. As the defendants admit, males in the plaintiff class relied upon this application of the law after September 1974 in forbearing from seeking and accepting alternative employment.[39] Since the male plaintiffs' contractual rights immediately prior to the 1975 Act were defined by their reliance interest, their rights were in fact, as they must be under Title VII, identical to those of the female members of the plaintiff class.

## C. Connecticut's Impairment of Its Contractual Obligations

The contract clause prohibits certain impairments by states of contractual obligations. Recent Supreme Court cases have been concerned with whether such impairments are merely "technical" in nature, *United States Trust Co. v. New Jersey, supra,* 431 U.S. at 21, 97 S.Ct. at 1517. "The severity of the impairment measures the height of the hurdle the state legislation must clear." *Allied Structural Steel Co. v. Spannaus, supra,* 438 U.S. at 245, 98 S.Ct. at 2723. The defendants have conceded that if prior law created contractual obligations on the part of the state, the 1975 Act represents an impairment of Connecticut's obligations to the plaintiffs.[40] The court finds, moreover, that the acknowledged impairment here is not a "technical" one.

The 1975 Act requires the plaintiffs to work up to five additional years in order to obtain the benefits which the state promised them under the contract created by prior law. It reduces, as a practical matter, the retirement income which members of the plaintiff class can expect to receive, and in some instances will prevent class members from receiving pension benefits altogether. Because the 1975 Act thus operates to reduce substantially the value of the plaintiffs' contractual expectations without providing them with any compensatory benefits, it constitutes a significant impairment

---

38. In view of the clear holding in *Fitzpatrick* that the provisions of state law applicable to men violated Title VII, those provisions must, under the supremacy clause of the United States Constitution, yield to the requirements of the federal statute. *See Stryker v. Register Publishing Co.,* 423 F.Supp. 476, 479 (D.Conn. 1976) (Newman, J.).

39. *See* pp. 532–533 & n.20, *supra.*

40. At oral argument on the pending motion, the court asked defendants' counsel whether, assuming *arguendo* the existence of a contractual obligation, the 1975 Act impaired the state's obligation to its employees. Counsel responded:

"Yes, I think I would have to concede that asking a particular state employee to work five years more would be an impairment of the contract."

Transcript of Oral Argument on Plaintiffs' Motion for Summary Judgment, Feb. 7, 1980, p. 37.

of the state's contractual obligations to the plaintiffs. *See, e. g., In re State Employees' Pension Plan, supra,* 364 A.2d at 1234–36 (Delaware statute permitting invasion of pension fund into which beneficiaries made contributions for the payment of benefits to non-contributing employees violated the contract clause of the federal Constitution); *Sylvestre v. State, supra,* 298 Minn. at 155, 214 N.W.2d at 666 (Minnesota statute depriving retired judges of the benefits of an "escalator" provision which tied their pensions to the salaries of active judges violated the contract clause of the United States Constitution and an analogous provision in the Minnesota Constitution); *Opinion of the Justices,* 364 Mass. 847, 864, 303 N.E.2d 320, 329 (1973) (proposed statute materially increasing the required contributions of state employees to pension fund without increasing the benefits they ultimately could expect was "presumptively unconstitutional" under the contract clause). *Cf. United States v. Larionoff,* 431 U.S. 864, 879–82, 97 S.Ct. 2150, 2159–60, 53 L.Ed.2d 48 (1977) (statute repealing provision for reenlistment bonuses for members of Navy who agree to extend their terms of service held to apply only prospectively; retroactive application would interfere with "contractual entitlements" and create "serious constitutional questions"); *Caola v. United States,* 404 F.Supp. 1101, 1106–07 (D.Conn.1975) (Blumenfeld, J.).

Because the facts of this case demonstrate an undeniable "[s]evere impairment" of contract, the court must undertake "a careful examination of the nature and purpose of the state legislation." *Allied Structural Steel Co. v. Spannaus, supra,* 438 U.S. at 245, 98 S.Ct. at 2723.

### D. The Unconstitutionality of Connecticut's Impairment of Its Contractual Obligations

#### 1. The "Reserved Powers" Doctrine

■ This examination must begin with an inquiry into the issue of whether the "reserved powers" doctrine shields the state from the contract clause challenge. As the Supreme Court has stated, a court "must attempt to reconcile the strictures of the Contract Clause with the 'essential attributes of sovereign power,' [*Home Building & Loan Association v. Blaisdell, supra,* 290 U.S.] at 435, [54 S.Ct. at 239,] necessarily reserved by the States to safeguard the welfare of their citizens. *Id.,* at 434–440, [54 S.Ct. at 238–240.]" *United States Trust Co. v. New Jersey, supra,* 431 U.S. at 21, 97 S.Ct. at 1517.

■ Where, as in the case at bar, a state is found to have impaired the obligation of its own contract, the "reserved powers" doctrine imposes on a court the obligation to undertake the inquiry described in *United States Trust Co. v. New Jersey, supra* :

"The initial inquiry concerns the ability of the State to enter into an agreement that limits its power to act in the future. As early as *Fletcher v. Peck,* the Court considered the argument that 'one legislature cannot abridge the powers of a succeeding legislature.' 6 Cranch, at 135. It is often stated that 'the legislature cannot bargain away the police power of a State.' *Stone v. Mississippi,* 101 U.S. 814, 817, [25 L.Ed. 1079] (1880). This doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment. In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."

431 U.S. at 23, 97 S.Ct. at 1518 (footnote omitted).

As the Court observed in *United States Trust Co.,* earlier Supreme Court decisions divided the powers of the states into those which could not be "contracted away" (such as the police power and the power of eminent domain) and those which a state could exercise in a manner which would bind it in the future; chief among the latter were the taxing and spending powers. *United States Trust Co. v. New Jersey, supra,* 431 U.S. at 23–24 & nn. 20–21, 97 S.Ct. at 1518 & nn.20–21. Of this historic dichotomy, Justice Blackmun wrote for the Court:

"Such formalistic distinctions perhaps cannot be dispositive, but they contain an important element of truth. Whatever the propriety of a State's binding itself to a future course of conduct in other contexts, *the power to enter into effective financial contracts cannot be questioned.*" 431 U.S. at 24, 97 S.Ct. at 1518 (emphasis added).

■ A purely financial obligation—such as the promise in *United States Trust Co.* not to deplete the revenues and reserves securing the bonds of the Port Authority, or the promise here to pay state employees retirement benefits established by state law —"may not be said automatically to fall within the reserved powers that cannot be contracted away." *United States Trust Co. v. New Jersey, supra,* 431 U.S. at 24–25, 97 S.Ct. at 1519. Accordingly, the 1975 Act cannot escape further judicial scrutiny under the contract clause on the ground that the "reserved powers" doctrine prohibited Connecticut from entering into a binding contract to provide pension benefits for its employees.

### 2. Judicial Scrutiny Under the United States Trust Co. Tests

■ An exercise of the spending power which creates a contract whose enforcement is not barred by the "reserved powers" doctrine may nonetheless be modified by the state legislature in certain circumstances. While the 1975 Act enjoys no immunity from a challenge under the contract clause merely because its predecessor statutes were passed in the exercise of the legislature's power to expend money from the public treasury, it may yet pass constitutional muster if it is "*both reasonable and necessary*" to "serve an important public purpose." *United States Trust Co. v. New Jersey,* 431 U.S. at 29, 97 S.Ct. at 1521; *id.* at 25, 97 S.Ct. at 1519 (emphasis added). However, as Justice Blackmun has noted, the application of the tests of necessity and reasonableness requires a much greater degree of judicial scrutiny in cases, such as this one, involving legislation which purports to abrogate a state's own financial obligation than in cases involving an impairment by the state of purely private contracts.[41]

"[C]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."

*United States Trust Co. v. New Jersey, supra,* 431 U.S. at 26, 97 S.Ct. at 1519 (footnote omitted).[42]

**41.** The dual standard of judicial scrutiny employed by the Court was suggested in Note, *The Constitutionality of the New York Municipal Wage Freeze and Debt Moratorium: Resurrection of the Contract Clause,* 125 U.Pa.L.Rev. 167, 184–91 (1976); *see United States Trust Co. v. New Jersey, supra,* 431 U.S. at 26 n.25, 97 S.Ct. at 1519 n.25. Several commentators have expressed the view that this dual standard breathes new life into the contract clause, at least in cases involving contracts to which states or their subdivisions are parties. *See, e.g.,* Note, *The Contract Clause: Is There Life After Death?,* 30 Baylor L.Rev. 191 (1978); Comment, *Constitutional Law: Contract Clause Protection of Municipal Bond Obligations,* 29 U.Fla.L.Rev. 1000, 1010 (1977). While, as a general proposition, this may be accurate, the point should not be overstated. Even in the immediate aftermath of *Home Building & Loan Association v. Blaisdell, supra*

—the case which is often considered to have signaled the demise of the contract clause—the Supreme Court voided state laws which unreasonably and unnecessarily impaired contractual obligations. *See, e. g., W.B. Worthen Co. v. Kavanaugh,* 295 U.S. 56, 60–63, 55 S.Ct. 555, 556–558, 79 L.Ed. 1298 (1935); *W.B. Worthen Co. v. Thomas,* 292 U.S. 426, 432–34, 54 S.Ct. 816, 518–519, 78 L.Ed. 1344 (1934). *See generally* B. Wright, *The Contract Clause of the Constitution* 111–19 (1938).

**42.** Justice Blackmun's observation that "[a] governmental entity can always find a use for extra money, especially when taxes do not have to be raised," 431 U.S. at 26, 97 S.Ct. at 1519, is strikingly reminiscent of the remarks of the sponsor of the amended bill which became the 1975 Act: "I'm sure this House will be able to find a place to use [the] three to five

As the legislative history of the 1975 Act demonstrates, the twin purposes of the legislation were the correction of what the legislature deemed an imprudent policy of allowing some state employees to retire with pension benefits at age 50 and the reduction of state spending. The state's decision to establish or change a policy of permitting its employees to retire with pension benefits at whatever age the legislature chooses—whether 50, 55, or a higher age—is one which the court does not question, for the wisdom of such a policy is not a proper concern of this court. The desirability of reducing the state's financial burdens is beyond doubt. Without questioning that the state's objectives here are "important public purpose[s]" within the meaning of the test established by the Supreme Court in *United States Trust Co.*, the court must nonetheless examine the 1975 Act to determine whether it was both "necessary" to the achievement of these policy goals and "reasonable in light of the surrounding circumstances." [43] *See United States Trust Co. v. New Jersey, supra,* 431 U.S. at 31, 97 S.Ct. at 1522. If the 1975 Act fails *either* of these tests, it must be held unconstitutional. The court finds that it fails both.

*(a) Necessity*

The inquiry into the "necessity" component of the *United States Trust Co.* standard "can be considered on two levels": first, whether "a less drastic modification" of contractual obligations would have been sufficient to accomplish the state's purposes, and second, whether, without modifying its obligations at all, the state "could have adopted alternative means of achieving [its] goals . . . ." *United States Trust Co. v. New Jersey, supra,* 431 U.S. at 29–30, 97 S.Ct. at 1521–1522. It is no answer that "choosing among these alternatives is a matter for legislative discretion," since

"a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well."

*United States Trust Co. v. New Jersey, supra,* 431 U.S. at 30–31, 97 S.Ct. at 1522.

The General Assembly clearly could have accomplished the first goal of the 1975 Act—correcting what it believed to be an unsound policy of permitting some state employees to retire with pensions as early

million dollars [to be saved] should this amendment pass." *General Assembly Proceedings 1975: House of Representatives* 6346 (remarks of Rep. Wright). The Supreme Court's own straightforward explanation of the need for closer scrutiny where the state has impaired its own contractual obligations is thus borne out by the record before the court in this case. Clearly, the rationale for careful examination of the legislature's action, in a case such as this has nothing to do with the existence or intimation of "legislative venality or corruption," as one commentator has suggested. *See The Supreme Court, 1976 Term,* 91 Harv.L.Rev. 70, 89 (1977).

**43.** Because this court does not review the merits or wisdom of the state's decisions on matters of public policy in determining the constitutionality of the statute, it cannot fairly be said that the application of the *United States Trust Co.* tests revives "the heyday of economic due process associated with *Lochner v. New York,* 198 U.S. 45, [25 S.Ct. 539, 49 L.Ed. 937] (1905), and similar cases long since discarded," *United States Trust Co. v. New Jersey, supra,* 431 U.S. at 60–61, 97 S.Ct. at 1537 (Brennan, J.,

dissenting). *Lochner* and similar decisions were based on the premise, no longer tenable in modern constitutional jurisprudence, that the Constitution forbids the enactment of any legislation designed to achieve certain goals. For example, in *Lochner,* the Court held that it was not within a state's power to regulate the hours a baker might be required to work, on the ground that the due process clause made this an impermissible purpose of state legislation. *See generally* L. Tribe, *American Constitutional Law* § 8–4 (1978). However, the contract clause analysis undertaken here does not prohibit the state from exercising its sovereignty to achieve any particular goal. The inquiry which the court undertakes is only an examination of the necessity and reasonableness of the means chosen to achieve concededly proper, and indeed important, legislative ends. The court does not in any way second-guess the legality or desirability of the purposes which the General Assembly sought, as a matter of public policy, to advance in adopting the 1975 Act.

as their 50th birthdays—without impairing any of the state's contractual obligations.[44] Having originally determined that retirement with pension benefits at age 50 is, in some circumstances, appropriate, the legislature is certainly entitled to reconsider its judgment and raise the retirement age to 55 or any other age it deems appropriate.[45] However, the state could have attained this goal without affecting the contractual rights of the plaintiffs; indeed, to the extent that the 1975 Act applies prospectively—*i. e.*, to those who were not in state service as of its effective date—the legislature has accomplished this purpose without injuring contractual rights. The "evident and more moderate course," *United States Trust Co. v. New Jersey, supra*, 431 U.S. at 31, 97 S.Ct. at 1522, of a purely prospective change in the retirement ages serves Connecticut's unquestioned interest in establishing what its legislature considers a more reasonable scheme of retirement ages equally well and without impairing the obligations of its contracts.

The second purpose of the 1975 Act—saving money—could likewise have been accomplished without affecting the contractual rights and obligations created by the State Employees Retirement Act, as modified by *Fitzpatrick* and as in force at the time the legislature passed the 1975 Act. The General Assembly is of course free to choose among legislative options which would have the laudatory effect of reducing the burdens borne by Connecticut's taxpayers. However, nothing in the record indicates that it was impossible for the legislature to reduce state spending without abrogating the state's contract with the plaintiffs. Indeed, common sense suggests the existence of other options; the legislature must have had available to it myriad alternative ways of exercising fiscal restraint without affecting constitutionally protected rights.

This is not a case where the legislature found itself confronted by a dire fiscal emergency which impaled the state on the horns of the dilemma of either repudiating its contractual obligations or ceasing to perform such basic governmental functions as protecting its citizens' health, safety and welfare. This case is thus readily distinguishable from *Ropico, Inc. v. City of New York*, 425 F.Supp. 970 (S.D.N.Y.1976) and *Subway-Surface Supervisors Association v. New York City Transit Authority*, 44 N.Y.2d 101, 404 N.Y.S.2d 323, 375 N.E.2d 384 (1978), two important New York cases which recently upheld state legislation challenged under the contract clause.

In *Ropico*, which was decided before the Supreme Court's decision in *United States Trust Co.*, the court upheld against a contract clause challenge state legislation which suspended for a three-year period repayment of the principal on certain short-term notes issued by the City of New York, but which permitted the affected noteholders either to exchange their notes for the longer-term obligations of a special state agency (the Municipal Assistance Corporation) or to obtain interest on their notes

44. In fact, some of the provisions of the 1975 Act have no effect on the former policy of permitting retirement with benefits at age 50. *See, e. g.*, Conn.Gen.Stat. § 5–162(d)(1) (raising age from 55 to 60 for certain employees). The impairment of contractual obligations which results from the application of those provisions to members of the plaintiff class is wholly unrelated to the goal of putting an end to retirements at age 50. Such sections of the statute can be upheld, if at all, only on the theory that they were necessary and reasonable means of achieving the state's goal of saving money.

45. Clearly, no provision of the United States Constitution or of federal law requires Connecticut to allow its employees to retire with pension benefits at age 50 or, for that matter, any other age. This court's decision in *Fitzpatrick v. Bitzer* held only that the state, having already granted certain females in its employ the right to retire with benefits at age 50, was required by Title VII to give similarly situated males the identical right. Nothing in *Fitzpatrick, see* 390 F.Supp. at 290, and indeed nothing in this opinion, limits the legislature's discretion to change retirement ages on a prospective and non-discriminatory basis in accordance with its policy judgments. Because it was Connecticut's own legislative decision that permitted retirement at age 50, and conferred contractual rights to retire at that age upon some employees, the state cannot complain that it is onerous to be held to that contract or its consequences. Any resulting injury is self-inflicted.

until the principal was repaid.[46] In *Subway-Surface Supervisors Association*, the court held that the contract clause did not prohibit a temporary freeze on the wages of New York City employees as part of another statute designed to alleviate the city's fiscal emergency.

The statutes under challenge in *Ropico* and *Subway-Surface Supervisors Association* were both passed by the New York Legislature, in extraordinary sessions, on the basis of detailed legislative findings of fact which spelled out the conditions that constituted a grave emergency, threatening the city's very existence as a viable governmental entity.[47] In both *Ropico* and *Subway-Surface Supervisors Association*, the legislation under attack was necessary to

**46.** In *Flushing National Bank v. Municipal Assistance Corp.*, 40 N.Y.2d 731, 390 N.Y.S.2d 22, 358 N.E.2d 848 (1976) (Breitel, C. J.), the New York Court of Appeals held that the debt moratorium statute which was also the subject of the *Ropico* litigation violated article VIII, section 2 of the New York Constitution, which prohibits any city in the state from contracting any indebtedness without pledging its "full faith and credit" for repaying the debt. Although the lower courts in *Flushing National Bank* had held that the statute violated neither the state constitution nor the contract clause of the United States Constitution, the Court of Appeals, New York's highest tribunal, found it unnecessary to reach the federal constitutional question in light of its holding under the New York Constitution. *Flushing National Bank v. Municipal Assistance Corp., supra*, 40 N.Y.2d at 739, 390 N.Y.S.2d at 28, 358 N.E.2d at 854.

**47.** The preamble to the New York State Financial Emergency Act for the City of New York, 1975 N.Y.Laws, ch. 868, § 1, enacted in September 1975 and challenged in *Subway-Surface Supervisors Association*, provides in part:

"It is hereby found and declared that a financial emergency and an emergency period exists in the City of New York. *The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities.* Unless such funds are obtained the city will soon (i) fail to pay salaries and wages to employees and amounts owed vendors and suppliers to the city, (ii) fail to pay amounts due to persons receiving assistance from the city and (iii) default on the interest and principal payments due the holders of outstanding obligations of the city.

If such failures and defaults were to occur, the effect on the city and its inhabitants would be devastating: (1) unpaid employees might refuse to work; (2) unpaid vendors and suppliers might refuse to sell their goods and render services to the city; (3) unpaid recipients of public assistance would be unable to provide themselves with the basic necessities of life; and (4) unpaid holders of city obligations would seek judicial enforcement of their legal rights as to city revenues. *These events would effectively force the city to stop operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants.*

The difficulties of finding solutions to such events would be compounded by the likelihood that the city, as well as the municipal assistance corporation for the city of New York, would be foreclosed from seeking funds in the public markets. The elimination of the public markets as a source of funds would leave the city with no foreseeable way to refund its outstanding short-term indebtedness. *Thus the city might be unable for an extended period to cure default on its outstanding obligations and that event could almost permanently destroy the fiber of the city.*

\* \* \*

*This situation is a disaster and creates a state of emergency.* To end this disaster, to bring the emergency under control and to respond to the overriding state concern described above, the state must undertake an extraordinary exercise of its police and emergency powers under the state constitution, and exercise controls and supervision over the financial affairs of the city of New York, but in a manner intended to preserve the ability of city officials to determine programs and expenditure priorities within available financial resources."

\* \* \*

(emphasis added).

In November 1975, the New York Legislature, at another extraordinary session, adopted the legislation that was attacked in *Ropico*, the New York State Emergency Moratorium Act for the City of New York. This statute included a preamble, 1975 N.Y.Laws, ch. 874, § 1, expressing a legislative finding that the city's fiscal emergency had seriously deteriorated since the previous special legislative session:

"It is hereby found and declared that the grave public emergency found and declared to exist by the legislature in adopting the New York State Financial Emergency Act for the City of New York has dramatically worsened in the last two months. Today, not only is the City of New York threatened with default on its outstanding obligations, but financially sound agencies of the state itself are similarly threatened because of pubic fears about the effects of default by the city."

prevent an unparalleled financial crisis from, in the words of the Legislature, "almost permanently destroy[ing] the fiber of the city." [48] Connecticut was not backed into any such corner in 1975; [49] the General Assembly which passed the legislation under attack in this action was not forced to choose between abrogating its contractual commitments or permitting the state to become insolvent, and thereby unable to continue to function as a viable governmental entity.

Accordingly, the court finds that the retroactive application of the 1975 Act to the plaintiffs cannot be justified, under the *United States Trust Co.* test, as an impairment of contractual obligations which was necessary to achieve the state's concededly legitimate and important purposes.

### (b) Reasonableness

As applied to the plaintiff class, the 1975 Act is not "reasonable in light of the surrounding circumstances," as required by *United States Trust Co. v. New Jersey, supra,* 431 U.S. at 31, 97 S.Ct. at 1522.[50]

The Court there rejected New Jersey's argument that unforeseen changes occurring after the adoption of a 1962 bondholders' covenant justified as "reasonable" 1974 legislation which repealed the 1962 covenant and impaired the contractual obligations established by that covenant. In doing so, the Court indicated that unforeseen subsequent circumstances might, in an appropriate case, be sufficient to demonstrate that a law impairing pre-existing contractual obligations was "reasonable in light of the surrounding circumstances." Referring to *El Paso v. Simmons, supra,* the Court wrote:

"There a 19th century statute had effects that were unforeseen and unintended by the legislature when originally adopted. As a result speculators were placed in a position to obtain windfall benefits. The Court held that adoption of a statute of limitation [for the reinstatement rights of purchasers of state land who had defaulted on their interest obligations] was a reasonable means to 'restrict a party to those gains reasonably to be expected from the contract' when it was adopted. 379 U.S., at 515, 85 S.Ct. at 587."

*Blaisdell,* 290 U.S. 398, 420–21, 421 n.3, 444–45, 54 S.Ct. 231, 233 n.3, 242, 78 L.Ed. 413 (1934) (crediting, and relying upon, express findings of legislature concerning economic emergency). Significant, too, is the fact that the defendants have not argued that the present condition of Connecticut's finances militates against a judgment for the plaintiffs. Indeed, the defendant state officials have not called to the court's attention any facts concerning the impact on the state's finances of a decision upholding the plaintiffs' challenge to the application of the 1975 Act to them.

**48.** New York State Financial Emergency Act for the City of New York, 1975 N.Y.Laws, ch. 868, § 1.

**49.** In the course of the brief debates which preceded the adoption of the 1975 Act by the General Assembly, several legislators alluded to New York City's fiscal crisis, arguing that unless Connecticut began to exercise fiscal restraint in administering its pension system, it might subsequently find itself in the dire straits into which New York City had already fallen. *See, e. g., General Assembly Proceedings 1975: House of Representatives* 6348 (remarks of Rep. Dice); *id.* at 6351 (remarks of Rep. Nevas). Such occasional invocations of New York City's grave difficulties were apparently designed to sound an alarm for the future, rather than to describe the financial condition of Connecticut in 1975. Nothing in the record of the General Assembly proceedings relating to the 1975 Act suggests that the financial problems of this state were in any sense comparable to the New York City fiscal crisis, or that the legislation enacted by the General Assembly was part of a comprehensive program to remedy or prevent any such crisis in Connecticut. It is noteworthy in this regard that the 1975 Act was not accompanied by legislative findings of imminent financial catastrophe, such as those reproduced in note 47, *supra. See also Home Building & Loan Association v.*

**50.** The "reasonableness" test may well be, as one critic of *United States Trust Co.* has written, "redundant" in light of the apparently more searching inquiry, also contemplated by *United States Trust Co.,* into the necessity of the impairment of contractual obligations. *See The Supreme Court, 1976 Term,* 91 Harv.L.Rev. 70, 87 (1977); *see also United States Trust Co. v. New Jersey, supra,* 431 U.S. at 55 n.17, 97 S.Ct. at 1534 n.17 (Brennan, J., dissenting). The court, however, declines to ignore this test, recently set forth by the Supreme Court, even though its determination that the 1975 Act does not meet the stringent "necessity" test may technically relieve the court of the need to examine the reasonableness of the legislation.

*United States Trust Co. v. New Jersey, supra,* 431 U.S. at 31, 97 S.Ct. at 1522 (footnote omitted).

The application to this case of the concept of unforeseen circumstances giving rise to unintended "windfalls" (as in *El Paso*), on the basis of this court's decision in *Fitzpatrick,* is troublesome. The pension benefits granted to female employees after *Fitzpatrick* cannot be deemed unforeseeable "windfalls," because Judge Clarie's decision did not change the terms of their entitlement to such benefits. However, it is arguable [51] that this characterization is applicable to the benefits which the state was required to pay male employees as a result of *Fitzpatrick.* Thus, the defendants might have attempted to justify the 1975 Act as a "reasonable" attempt to " 'restrict [male members of the plaintiff class] to those gains reasonably to be expected from the contract' when it was adopted," *United States Trust Co., supra,* 431 U.S. at 31, 97 S.Ct. at 1522, *quoting El Paso v. Simmons, supra,* 379 U.S. at 515, 85 S.Ct. at 587, and to prevent male plaintiffs from reaping "windfalls." However, such a construction would require the court to uphold the 1975 Act in its effect on males in the plaintiff class (including men who were also members of the plaintiff class in *Fitzpatrick v. Bitzer*) but invalidate it as it applies to female plaintiffs. A holding that the contract clause permits the impairment of Connecticut's obligations to men, but not women, in the plaintiff class would, of course, permit the state to treat male plaintiffs in the discriminatory manner which Judge Clarie found unlawful under Title VII. Such disparate treatment of men and women, explicitly forbidden by this court's enforcement of Title VII in *Fitzpatrick,* could not possibly be regarded as "reasonable in light of the surrounding circumstances."

Moreover, factors other than "unforeseen circumstances" which have been deemed relevant to the "reasonableness" inquiry militate against a finding that the 1975 Act was reasonable as applied to the plaintiffs. The effect of the 1975 Act on the plaintiffs would not be "simply a temporary alteration of the contractual relationships" in question, *Allied Structural Steel Co. v. Spannaus, supra,* 438 U.S. at 250, 98 S.Ct. at 2726. Rather, it would work "a severe, permanent, and immediate change in those relationships—irrevocably and retroactively." *Id.* Nor does the scope of the 1975 Act, as it applies to persons in the state's employ as of its effective date, appear reasonable. The statute does not apply equally to all who were then in state service; instead, it singles out those who would not reach the age for normal retirement within the next five years. The defendants have offered no justification or explanation for the decision to "grandfather in" some state employees, while leaving the plaintiffs subject to the new eligibility requirements for pension benefits. *Cf. Allied Structural Steel Co. v. Spannaus, supra,* 438 U.S. at 250, 98 S.Ct. at 2725.

Accordingly, the court cannot conclude that the 1975 Act, as applied to the plaintiffs, was a reasonable method of furthering the state's interests.

## V. CONCLUSION

On the basis of the admitted and stipulated facts, the court finds that Connecticut and the members of the plaintiff class were parties to a valid and binding contract. Immediately prior to the time the 1975 Act became law, this contract required the state to permit both male and female members of that class to retire on the terms of the State Employees Retirement Act which, before this court's decision in *Fitzpatrick,* had applied only to female employees. The court finds that the 1975 Act severely impairs the obligations of this contract. Indeed, although they have claimed that the plaintiffs have no contractual rights, the defendants have conceded that if any such rights existed, the 1975 Act impaired the state's

---

**51.** Neither in their briefs nor at the hearing on this motion did the defendants offer any arguments in support of the necessity or reasonableness of the 1975 Act, as applied to the plaintiffs. Indeed, the only question presented by the instant motion which defendants' counsel addressed was the preliminary inquiry into whether a contract existed.

contractual obligations to the plaintiffs. That impairment cannot be justified, under the tests set forth by the Supreme Court in *United States Trust Co.*, as either "necessary" to "serve an important public purpose" or "reasonable in light of the surrounding circumstances." The 1975 Act, as applied to the plaintiffs, thus unconstitutionally impaired the state's contractual obligations.

This conclusion in no way affects the constitutionality of the 1975 Act insofar as it applies to employees who entered state service after June 30, 1975. Nor does it prevent the members of the legislature, as the duly elected representatives of the people of Connecticut, from enacting in the future any legislation on the subject of state employees' pensions which comports with their considered judgment and wisdom on matters of public policy and does not interfere with rights protected by the Constitution or laws of the United States. In his opinion in *Fitzpatrick*, Judge Clarie expressly stated:

> "Nothing herein shall be construed to interfere with the State Legislature performing its constitutional function of freely determining public policy, as it pertains to deciding upon a uniform retirement age for all men and women employees of the State of Connecticut *in the future*, provid[ing] the same is carried out without discrimination as to age or benefits on the basis of sex."

*Fitzpatrick v. Bitzer, supra*, 390 F.Supp. at 290 (emphasis added). To those words this court today only adds the proviso, which inheres in our constitutional system, that such legislation as the state may enact on this subject may not transgress the limitations on state power, such as the contract clause, which are embodied in the United States Constitution.

The plaintiffs' motion for summary judgment is granted. A permanent injunction shall issue, requiring the defendants to administer the State Employees Retirement Act in a manner which respects the plaintiffs' contractual rights. The parties shall settle within ten days an order consistent with this memorandum of decision, ensuring that the State Employees Retirement Act is administered in a way which protects the contractual rights of every member of the plaintiff class, and curing each of the various types of injury which the 1975 Act works upon their constitutionally protected expectations. The order shall further provide for notice of this decision to be sent to all members·of the plaintiff class and shall include a proposed form of notice to the class.

It is so ordered.